THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM DUNCAN, Defendant-Appellant.

Third District   No. 3—83—0659

Opinion filed May 16, 1985.—Rehearing denied June 21, 1985.

Louis F. Pignatelli, of Rock Falls, and Ramsey Clark and Lawrence W. Schilling, both of New York, New York, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

On October 28, 1982, a 14-count indictment was returned by the Whiteside County grand jury charging the defendant, William Duncan, and a codefendant, Perry Olinger, not a party to this appeal, with the offenses of murder, armed robbery, armed violence and conspiracy. They were tried to a jury, and both were found guilty on all counts. Duncan was sentenced to life imprisonment for murder and 10 years for armed robbery. All other verdicts against him were vacated.

### SUFFICIENCY OF THE EVIDENCE

Duncan asserts that there was no evidence which showed he committed any of the crimes with which he was charged either as a principal actor, on a theory of accountability, or as a conspirator. In order to determine whether the evidence was sufficient to support his conviction, a summary of the evidence adduced at trial is necessary.

On the morning of May 25, 1982, James Adams was murdered in his home in Rock Falls. He was stabbed in the throat, causing a five-inch deep wound which severed a jugular vein. Further, he was cut four or five other times on the throat, and his head was struck five or six times, causing multiple skull fractures. On the same morning, Gordon Stevens and Debbie Bushman were murdered in a home they shared in neighboring Sterling. Each was shot once in the head at close range by a .22-caliber pistol.

Adams' body was discovered by his girlfriend, Tina Tabor, at about 10:15 a.m. the same morning. She found him lying on his back in a pool of blood. She went into the living room to call an ambulance, where she found Adams' Great Dane dog lying on the floor and Duncan lying under a blanket on a couch. Tabor called Duncan's name,

and, after getting no response, she nudged him and he sat up. She told him she thought. Adams was dead. Together they summoned the police and an ambulance. Tabor took Adams' dog outside to tie him up. She stated the dog appeared "druggy" or "sluggish" looking and was limping, which was not normal for the animal to do upon waking up. The police arrived shortly and began their investigation. The bodies of Stevens and Bushman were discovered about 11:30 a.m. that same morning by a friend of Bushman's. The Rock Falls police were summoned and began their investigation. Subsequently, a task force was established to coordinate both investigations.

Adams and Duncan had returned from Kansas City on May 23 with five pounds of marijuana and over three ounces of 95% pure cocaine, which Adams had purchased from a friend of Duncan's, Ed Kline. This was the third trip to purchase drugs from Kline that Adams and Duncan had made. Adams successfully sold the drugs from the first two trips and used this money to make the last purchase. On each of these occasions it was Adams who made the purchase, not Duncan. Duncan had previously worked for Kline and was able to put Adams in touch with him.

Upon returning from Kansas City after the third trip, Adams and Duncan stopped at codefendant Olinger's house, where the three of them and Olinger's girlfriend, Rhonda Odquist, used some of the cocaine. Adams' reason for doing this was to help get the word out that he had a good supply of cocaine. Other phone calls were made for the same reason. Adams and Duncan then left and arrived at Adams' house on the morning of May 24, a day which turned out to be very eventful.

A steady stream of people came by the Adams house on the 24th, and some purchased cocaine. Olinger stopped and offered to leave a .45-caliber pistol toward the price of some cocaine, but Adams declined. Olinger later returned with a rifle which Adams accepted in return for some cocaine. Between 9:30 and 10 p.m. that evening, Patty Doyle arrived and found only Adams and Duncan present. She and Duncan injected some of Duncan's cocaine. Apparently this was the last cocaine in Duncan's possession, because he later asked Adams for a free gram of cocaine, but Adams refused to give him any. Doyle decided to buy a gram but needed to get some money, so she left. She returned around 12:30 a.m., May 25. At this time she found Olinger in the kitchen with Adams and Duncan. He had arrived around midnight. Doyle paid Adams for the cocaine and told Duncan she would see him after a local bar closed at 1 a.m. She then left. She later returned to Adams' house. The lights were on. Olinger's truck was still

parked nearby. However, she found the back door locked. She knocked, but no one let her in. She then went home.

Adams left his house around 1 a.m. to go to the house of a friend, Randy Stralow. He took with him most of the cocaine remaining in his possession (some was left in a secret hiding place in his house) and also over $1,000 in cash. Before he left he gave Duncan a gram of cocaine which was to be given to Doyle upon her return to his house. Instead, Duncan and Olinger used the cocaine themselves. Also, sometime prior to his leaving, Adams passed a sleeping pill across the kitchen table to Duncan and told him "you need this."

Adams stayed with Stralow until approximately 7:30 a.m. During the time he was with Stralow, he received four telephone calls from Duncan. The first was to see if Adams was alright. The second was to notify Adams that his dog had gotten loose. The third was to let him know the dog had returned. Finally, the fourth call inquired as to when he would be returning home.

Upon returning home, Adams parked his van in his garage. Rather than take his cocaine into the house, he hid it in the garage. Shortly after entering the house he was murdered. None of the money he had in his possession was located. Adams' throat was cut and also had four slicing wounds which could be described as threatening or terror wounds. After Adams' body was on the floor, four or five linear blows were made to the forehead area, causing very severe skull fractures. Investigators lifted palm prints from the top of the kitchen stove, just above the place Adams' body was found, which were palm prints of codefendant Olinger.

The gun that was used to murder Stevens and Bushman was traced to Olinger. Olinger, Darrell Onken and Ed Stalder burglarized a home on the evening of May 22. Several guns were stolen, and Olinger kept an H&R .22-caliber Magnum pistol. The owner of the gun which was stolen told investigators he had killed two dogs with it. The body of one of the dogs was discovered and the bullets and fragments used were recovered. It was established that these bullets were fired from the same gun used to murder Stevens and Bushman.

Stalder testified of his involvement with Olinger including this burglary. Several times Olinger urged Stalder to join him in taking over the drug business in the area. Olinger wanted to eliminate the people presently in control, to rip them off of their drugs, and to make sure there were no witnesses left. He referred specifically to Adams and a Bill, meaning Duncan. Olinger also mentioned a drug source in Kansas City and that he could make the contacts. Stalder declined to participate. These discussions took place before and after

the May 22 burglary. On the evening of May 24, Olinger and Stevens were seen together in a lounge near Adams' house by Dave Ulve, who was told by them that they would have cocaine for sale later that night.

Other evidence disclosed that following the murders Olinger had cash which previous to the murders he did not have. Most damaging to Olinger was Doyle's testimony that a week after Adams' murder she and Olinger were talking in a lounge and Olinger mentioned that Adams told him he left all his cocaine at Stralow's house.

At trial Duncan defended on the theory that, while he was in the house at the time Adams was murdered, he slept through the incident. He testified that he could not sleep, so about 6 a.m. he took the sleeping pill he was previously given. He said this was just prior to the last time he called Adams. He then went to sleep, and the next thing he remembered was being awakened by Tabor. Duncan submitted to blood and urine tests that afternoon. They disclosed a presence in the blood of .44 mg. per milliliter of the active elements of Sinequan, the sleeping pill Duncan had taken.

Duncan was found guilty on all 14 counts. The trial judge sentenced Duncan to life imprisonment for the three murders and 10 years for armed robbery in connection with the Adams murder. All other verdicts against Duncan were vacated.

■ For reasons discussed below, as to whether sufficient evidence was presented to permit the jury to find Duncan guilty of murder beyond a reasonable doubt, we find that enough credible evidence was presented to support the jury's verdict of guilty.

Duncan relies heavily on cases that hold that where the evidence is circumstantial, the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. (See *People v. Trapps* (1974), 22 Ill. App. 3d 1029, 318 N.E.2d 108; *People v. Wilson* (1948), 400 Ill. 461, 81 N.E.2d 211; *People v. Mordick* (1981), 94 Ill. App. 3d 497, 418 N.E.2d 1057; *People v. Lewandowski* (1976), 43 Ill. App. 3d 800, 357 N.E.2d 647; *People v. Grizzel* (1943), 382 Ill. 11, 46 N.E.2d 78; *People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631; *People v. Wright* (1976), 43 Ill. App. 3d 458, 357 N.E.2d 224.) Duncan argues that the facts do not exclude the reasonable hypothesis of innocence that he did sleep through Adams' murder and that he was not observed sleeping on the couch by the murderer. To support this theory, Duncan presented evidence consistent with his claim that he had taken a sleeping pill on the morning of Adams' murder. Further, even though on cross-examination his experts testified that someone taking this type of sleeping pill would not likely be

able to be awakened within four or five hours, the shock of seeing his dead friend was enough of a jolt to wake him up sufficiently. Duncan contends this evidence satisfactorily refutes the theory presented by the State that he made a deal with Olinger to become his partner and control the drug traffic in the area.

The State presented evidence at trial to support an alternative theory of guilt. The State contended Olinger and murder victim Stevens entered into an agreement to control drug traffic in the area. This occurred after the State's witness Stalder's rejection of the same proposal. The problem with the Olinger-Stevens agreement was that neither had a source for obtaining the drugs. Duncan, however, did have a source, Ed Kline. The State further contended Olinger struck a better deal with Duncan during the early morning hours prior to Adams' murder. Proof of this was Stalder's testimony that Olinger planned to eliminate both Adams and Duncan. Olinger spent the night with Duncan at Adams' house. After Olinger killed Adams, knowing Duncan was still in the house, he would have looked for him. Had he discovered a sleeping Duncan on the couch, Olinger would not have taken a chance that Duncan slept through the murder. After all, Olinger told Stalder he would leave no witnesses. Olinger then left and went to Stevens' house and murdered him because he could tie Olinger into the Adams murder. Debbie Bushman was murdered because she just happened to be in the house. Olinger's promise that he would leave no witnesses was complete. Finally, the State contended that when Stevens and Bushman were killed to hide their role in the Adams death, Duncan became accountable for those deaths as well.

Initially, we note that a jury is not compelled to accept a defendant's account of what happened at the time of the crime, but is permitted to consider the surrounding circumstances and the probability or improbability of the defendant's theory. (*People v. Wiggins* (1957), 12 Ill. 2d 418, 147 N.E.2d 80.) We believe there was sufficient credible evidence from which the jury could find Duncan guilty of murder by accountability.

The Criminal Code of 1961 provides that:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1981, ch. 38, par. 502(c).)

Pursuant to the underlying intent of this statute, if the circumstances disclose there is a common design to do an unlawful act to which all assent, the act of one is the act of all. (See *People v. McClindon* (1973), 54 Ill. 2d 546, 301 N.E.2d 290; *People v. Washington* (1962), 26 Ill. 2d 207, 186 N.E.2d 259.) In the present case, the evidence supports a finding of guilt beyond a reasonable doubt that Duncan took part in a common felonious plan to cause the death of Adams. This evidence, even though it was circumstantial, was convincing enough to allow the jury to reasonably exclude the hypothesis of innocence presented by Duncan that he slept through the murder and that the murderer did not see him on the couch.

## SEVERANCE

Duncan and codefendant Olinger were jointly indicted in a 14-count indictment charging each with the murders of Adams, Stevens and Bushman and with other offenses related to the killings. Duncan made several motions, both before and during trial, for severance. Each motion was subsequently denied. Duncan argues that denial of his motions to sever was error.

Initially, Duncan contends the joinder of the Stevens-Bushman murder counts in one indictment with the counts relating to the murder of Adams was unauthorized under section 111—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 111—4(a)) because the charges were not "based on the same acts [*sic*] or on 2 or more acts which are part of the same comprehensive transaction."

█ It is well settled that a defendant may not be placed on trial for separate offenses when it appears these offenses are not part of the same transaction or occurrence. (*People v. Pullum* (1974), 57 Ill. 2d 15, 309 N.E.2d 565.) Factors to be considered in deciding the question of severance include, but are not limited to, proximity of time and location of the various charges, identity of evidence which would be presented to prove each charge, similarities of the acts, whether there was a common method of operation on the part of the perpetrator, and whether the same or similar evidence would be presented to prove the elements of the offenses charged. *People v. Thiele* (1983), 114 Ill. App. 3d 189, 448 N.E.2d 1025.

In support of his contention that severance would have been proper, Duncan asserts these criteria were not met because the Stevens-Bushman murders were separated by miles and perhaps hours from Adams' murder; a different weapon and type of weapon was used; there was no common method of operation by the perpetrator; and there was no apparent connection between the two occur-

rences. We disagree.

■ We believe the crimes were sufficiently related in time and distance to be properly joined. We are also of the opinion that the offenses were part of the same comprehensive transaction and, therefore, properly joined. It was disclosed that Olinger wanted to eliminate Adams and run the drug operations in the area. Further, that he would not leave any witnesses behind. Stevens could have tied Olinger to the Adams murder, and because of this he was also murdered. This was sufficient evidence to connect the two occurrences.

■ Duncan also assigns as error the failure to sever his trial from Olinger's. The decision to grant a separate trial is within the sound discretion of the trial court, and will not be reversed absent an abuse of that discretion. (Ill. Rev. Stat. 1981, ch. 38, par. 114—8; *People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356.) Generally, defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. (*People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d 461.) Motions for severance are commonly granted when the defenses presented by the codefendants are antagonistic to each other. (*People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398.) Mere apprehensions of prejudice are not sufficient grounds for severance. *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321.

In reviewing the trial court's decision on this issue, the record discloses that Duncan's motion for severance alleges that he believed Olinger made statements and admissions not attributable to Duncan, that he believed his defense would be antagonistic to Olinger's, that Olinger's record was severe and prejudicial, and generally that a joint trial would severely prejudice him in a number of material aspects. It is our opinion that these allegations were mere apprehensions and that the trial court did not abuse its discretion in denying Duncan's motions for severance. Further, we do not find the codefendant's defenses to be antagonistic.

### JURY INSTRUCTIONS

At the instructions conference, Duncan submitted as a requested jury instruction the IPI instruction on circumstantial evidence. (See Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.02 (2d ed. 1981).) The State tendered its instruction on circumstantial evidence which included only the first paragraph of IPI Criminal 2d No. 3.02. The court accepted the State's version, ruling Duncan's own testimony at trial contained direct evidence of what happened, thereby negating the applicability of the second paragraph. On appeal, Duncan

contends it was error to fail to instruct the jury that it should not find him guilty unless the facts or circumstances proved exclude every reasonable theory of innocence.

■ My views on the problems created by this instruction have been amply set forth in my special opinions in *People v. Fletcher* (1976), 40 Ill. App. 3d 537, 352 N.E.2d 10, *People v. Minish* (1974), 19 Ill. App. 3d 603, 312 N.E.2d 49, and *People v. Godsey* (1978), 57 Ill. App. 3d 364, 373 N.E.2d 95, and need not be restated once again here. While I may disagree with the trial court's holding that Duncan's testimony constituted direct evidence, such a determination is not necessary. Even had the full instruction been proper, there would be no basis for reversal. Duncan argues that every reasonable theory of innocence was not excluded at trial. It is established that where the record reflects a reasonable theory of innocence, reversal is warranted. (*People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520.) In the instant case, we have determined that the evidence was sufficient to support a verdict beyond a reasonable doubt. This determination, therefore, necessarily rules out any reasonable theory of innocence that would lead to a conclusion that the jury's verdict resulted from the omission of paragraph 2.

### CUMULATIVE ERROR

■ Duncan has raised several other issues of trial error, including erroneously admitted evidence, excluded evidence, restricted cross-examination and prosecutorial misconduct. We have reviewed these alleged errors and find no support for Duncan's contentions. Duncan has also raised an issue that the totality of errors warrants reversal. Based on the reasoning set forth in this opinion, we find no merit in Duncan's cumulative error argument.

### VERDICT

■ At Duncan's sentencing hearing, the trial court denied the State's request for the death penalty and instead sentenced him to a term of imprisonment for his natural life. In so doing, the court believed it was mandated to impose the life imprisonment sentence. Duncan contends the applicable sentencing statute grants discretion to impose a lesser sentence. (See Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—1(a)(1), 1005—8—1(c).) This issue was recently decided to the contrary in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, where the court upheld the statute's constitutionality and held the imposition of a life sentence under these circumstances as mandatory rather than permissive. In the instant case, the trial court did not err

in imposing the natural life sentence.

For the foregoing reasons, the judgment of the circuit court of Whiteside County is affirmed.

Affirmed.

HEIPLE, P.J., and SCOTT, J., concur.