(No. 62199.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM DUNCAN, Appellant.

*Opinion filed January 30, 1987.—Rehearing denied March 30, 1987.*

Ramsey Clark, Lawrence W. Schilling and Weldon Brewer, of New York, New York, and Louis F. Pignatelli,

of Rock Falls, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert, Assistant Attorney General, of Chicago, of counsel), for the People.

Thomas V. Gainer, Jr., and Rimas Cernius, Assistant State's Attorneys, of Chicago, for *amicus curiae* Richard M. Daley, State's Attorney.

JUSTICE WARD delivered the opinion of the court:

The defendant, William Duncan, was indicted with Perry Olinger in the circuit court of Whiteside County for crimes of murder, armed robbery, armed violence and conspiracy (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1, 18—2, 33A—2, 8—2). A jury found the defendants guilty on all counts and, following a hearing before the court on factors in aggravation and mitigation, Duncan was sentenced to life imprisonment on the counts charging murder and 10 years' imprisonment for armed robbery. The remaining convictions against him were vacated. The appellate court affirmed (133 Ill. App. 3d 489), and we granted his petition for leave to appeal under our Rule 315 (94 Ill. 2d R. 315).

Olinger was sentenced to death, and his convictions and sentence were affirmed on direct appeal by this court in *People v. Olinger* (1986), 112 Ill. 2d 324.

At approximately 10:15 a.m. on May 25, 1982, Tina Taber discovered the body of her boyfriend, James Adams, on the kitchen floor of his home in Rock Falls, Illinois. She testified that she found the defendant in an adjoining room sleeping on a couch. Tabor stated that the defendant did not respond when she called him, but he sat up after she "nudged" him. Taber said that he did not appear to immediately understand when she told him that she believed that Adams was hurt. She testified

that he was wearing the same clothes which she had seen him wearing the previous night. Adams' dog was in the room with Duncan, she said, and the animal was acting as if he had been "drugged." She tethered the dog in the backyard, then waited in front of the house with Duncan for the police to arrive.

Later that same morning, Susan Newman discovered the body of Gordon Stevens in the house he shared with Debra Bushman in Sterling, Illinois. Newman testified that she found the front door of the house slightly ajar, though customarily it was kept locked, and she stated that when she entered the house she saw Stevens' body just inside the house lying in a pool of blood. She notified the police, and a short time later Sterling police officer Fred Moore arrived at the house.

Moore testified that he entered the house and found Stevens lying on his back on the living room floor. He discovered the body of Debra Bushman in a hallway just beyond the kitchen. She was lying on her back with her feet propped against a wall. Moore said that there were no signs of forced entry into the house.

Pathologist Larry William Blum testified that Adams died as a result of a "cutting wound" which severed his trachea and transected his jugular vein. However, he said that the victim's vocal cords were not injured. He observed four additional wounds on the neck, though these he described as superficial. Dr. Blum testified that Adams' forehead had five distinct wounds which he said were inflicted with a blunt instrument. He was unable to determine if the wounds to the neck were administered before the trauma to the forehead. Dr. Blum also performed an autopsy on the body of Gordon Stevens; he concluded that Stevens died from a single gunshot wound to the head. He said that when discharged the weapon was held within 6 inches of Stevens' head. The doctor explained that he was unable to fix a definite

time of death for either victim, but he said that the extent of rigor mortis and the chemical analyses of body fluids of the victims indicated that they died sometime after midnight but before 11 a.m. on May 25.

William Rouse, the pathologist who performed the autopsy on Debra Bushman, testified that she died from a gunshot wound to the head. Dr. Rouse testified that the fatal shot was fired from less than 3 feet away. He estimated her time of death as sometime after midnight but before the early afternoon hours of May 25.

There was substantial testimony regarding events of the days preceding the murders. Edward Stalder told of a burglary of the house of Dennis Burris on the night of May 22. He testified that earlier that day he was in a tavern with Olinger and Darrell Onken, and that they agreed to commit a burglary. He said that later that night he broke into the Burris house with Olinger while Onken stood watch outside, and that five handguns, including a .22-caliber magnum pistol, were taken in the burglary. The weapons were put in a burlap sack which was placed in Olinger's pickup truck. Onken substantially corroborated Stalder's testimony, although Onken said that he did not know the contents of the burlap sack. Stalder stated that Olinger kept the .22-caliber magnum and recalled that, while riding with Olinger the next day, Olinger stopped his truck and "did some target practice" from the window.

Stalder testified that, while they were en route to meet Onken the night of the burglary, Olinger proposed that Stalder join him in "taking our control of the drug traffic in the area," and that they steal drugs and money from "Jim Adams and a Bill" and "make sure there wasn't [sic] any witnesses left." Stalder said that Olinger repeated the proposal after they had dropped off Onken following the burglary, but in both instances he told Olinger that he was not interested. Duncan's coun-

sel asked that the jury be instructed that any statements made by Olinger to Stalder and any testimony regarding the burglary of the house of Dennis Burris be considered only against Olinger and not be considered as evidence against Duncan. The court, having instructed the jury at the outset of Stalder's testimony that Olinger's out-of-court statements should not be considered against the defendant, declined to instruct the jury at that point.

Dennis Burris testified that a few months before the burglary of his home he had used the .22-caliber magnum pistol to shoot two stray dogs on his farm. The bodies of the dogs were exhumed, and James Edward Hamby, a firearms expert of the Department of Law Enforcement, testified that the pellets recovered from the dogs and the pellets recovered from the bodies of Stevens and Bushman were fired from the same gun.

There was evidence that during the two weeks preceding the murders Adams and the defendant had made three trips to Kansas City to purchase cocaine and marijuana from Edward Kline, a drug dealer known by Duncan. On the last trip on May 22, Adams and Duncan bought five pounds of marijuana and Adams bought three and one quarter ounces of cocaine. Adams and Duncan returned to Adams' house on May 24 and "got the word out" that they had drugs for sale.

Among their customers was Merle Merkel, who testified that she bought $1,050 worth of cocaine from Adams at around 9 a.m. on May 24, and that Duncan was in the house when she made the purchase. She said Olinger arrived at the house while she was there. She recalled that he did not have money to purchase cocaine and offered to exchange a .45-caliber gun for a gram of cocaine. Adams did not agree to that proposal. However, there was evidence that later that day Adams accepted a rifle from Olinger as collateral in a cocaine transaction.

Olinger's girlfriend, Rhonda Odquist, testified that

she accompanied Olinger to Adams' house between 11:30 and midnight on the evening of May 24, and that she waited 10 or 15 minutes in his truck before Olinger told her to come in the house. Adams and Duncan were in the house when she entered. She stated that most of the time she was in the house she watched television in the living room while Olinger and Duncan talked in the kitchen. She and Olinger left the house around 5 or 5:15 a.m. They arrived at their house around 6:15. Olinger left 20 or 25 minutes later to go fishing, she said, and she went to sleep. The witness next saw Olinger around 9:30 that morning.

Around 9 or 9:30 p.m. on May 24 Patty Doyle injected cocaine with the defendant at Adams' residence. An hour later Duncan asked Adams for more cocaine, she said, but Adams replied that Duncan already had too much cocaine. Doyle left to go to John's Tavern, one block away, but returned sometime after 11:30 to buy a gram of cocaine. She stated that she saw Rhonda Odquist in Olinger's truck outside the house. The defendant, Adams and Olinger were in the kitchen when she purchased the cocaine, and she told the defendant that she would be back after John's Tavern closed. Olinger's truck was still in the yard when she returned after 1:30 a.m. The lights were on in the house, but no one answered when she knocked at the door.

Doyle related that on the afternoon of May 25 she was with Olinger in a tavern in Morrison. She observed that Olinger was carrying a "wad" of bills. Doyle recalled that while sitting at the bar Olinger told her that Adams had told Olinger that he had left all of his cocaine at Randy Stralow's house. Counsel for both defendants objected on hearsay grounds. The court overruled the objection but instructed the jury that the statement should only be considered in determining the guilt or innocence of Olinger and should not be considered

against Duncan.

There was testimony by an attendant at a gas station in the area that Olinger paid past bills on May 27 with a $100 bill, and there was evidence that four $100 bills were found hidden in Olinger's truck on June 3.

Randolph Stralow related that he arranged for a friend, Michael Bowers, to purchase cocaine from Adams on May 25. Adams arrived at Stralow's house around 1 a.m. and, Stralow said, Adams appeared to be upset. The witness testified that Adams received four phone calls from the defendant while he was at the house. Over defendant's objection that the testimony was hearsay, Stralow was allowed to tell the jury what Adams told him was said in the conversations. The first call came at 2 a.m., he said, and the second call came around one hour later. The witness testified that during the second conversation Duncan told Adams that his dog was loose. Stralow recalled that Adams said that he believed that the dog was intentionally released. An hour or two later Duncan called to say that the dog had returned. Finally, between 4 and 5 o'clock that morning, Adams received the fourth call from Duncan asking whether "everything was all right" and informing him that Duncan intended to go to bed. On cross-examination, Stralow said the last call may have occurred as late as 5:30 or 6:15.

Stralow stated that he observed Adams with approximately $1,800 which he repeatedly counted while at the house. As Adams was leaving, he told Stralow that he felt bad because he believed he should tape his cocaine to his chest for safekeeping before returning home. Counsel for the defendant objected to the hearsay statement, but the objection was overruled.

The defendant testified that he did not receive any money for arranging for Adams to purchase drugs from Kline in Kansas City, but he did acknowledge that Adams gave him cocaine to use. He said that Adams prom-

ised to pay him $700 for each ounce of cocaine gotten from Kline on the last trip.

Duncan stated that Olinger arrived at Adams' house around 12:30 a.m. with Odquist. Adams left about one-half hour later. Before he left, Adams told the defendant that he should not take more cocaine because his arms were already bruised from injecting it with a syringe. Duncan said that he was concerned about Adams because they had been awake for three days and Adams had arranged to sell all the cocaine at Stralow's house. He was worried that Adams would be arrested while carrying large amounts of cocaine and money. He testified that he telephoned Stralow's house four times to speak to Adams but explained that it was his concern for Adams that led him to place the four calls.

The defendant testified that, after Adams left, Olinger paid him half of what he owed on a sale of marijuana which Olinger had received earlier, and he said that Olinger bought more marijuana. Duncan took it from a suitcase containing the marijuana purchased in Kansas City. Duncan admitted that he used cocaine with Olinger in the kitchen, but he denied that he discussed forming a partnership for the sale of cocaine with Olinger. He stated that Olinger left around 3:30 a.m. to look for Adams' dog, and he said that Olinger returned with the dog an hour later but left after a short while.

The defendant recounted that while alone in the house he tabulated the drug transactions of the day and left the paper with the figures on the dining room table. Around 5:30 he lay on the couch but was unable to sleep. He said that he took a sedative around 6 a.m., and that the next thing he remembered was Tabor waking him and telling him something was wrong with Adams.

He testified that he was disoriented when he awoke, but remembered assisting Tabor call an ambulance. He found the paper with the record of the cocaine transac-

tions near Adams' waist, he said, and he crumpled the paper and put it in his pocket. He said that he was preoccupied when he pocketed the paper, and that he turned the paper over to the police the next day. The paper was admitted into evidence, and subsequent testimony established that there were traces of blood on it.

Duncan submitted to blood analyses at the request of the police. The results of the analyses revealed that Duncan had ingested Sinequan, a sedative, but they were inconclusive as to when the tablet was ingested.

Dr. Charles Petty, a forensic pathologist who examined photographs of the area where Adams' body was found, testified for the defendant. He said that blood splatters in the area were consistent with an attack on the victim from behind and that the blows to his forehead were inflicted when Adams was on his back. He stated that his opinion was that blood splatters on Adams' shirt indicated that the wounds to the neck were the first inflicted because the upper portion of the body would have had to have been upright to cause the stains on his shirt. He concluded that, because the jugular vein was severed and would cause blood to flow to his lungs, Adams would not have been able to "force air effectively past the vocal cords in order to cause them to vibrate" and enable him to cry out. On cross-examination, Dr. Petty said his conclusions did not rule out the possibility that there was more than one assailant.

The defendant argues that he was denied a fair trial by the trial court's refusal to sever his trial from Olinger's. He complains that the murder and other charges related to Adams' death were not sufficiently related to the charges arising from the deaths of Stevens and Bushman, and consequently should not have been joined in the same indictment. He contends that a severance should have been granted because, he says, the jury improperly considered hearsay statements of the code-

fendant against him, and he asserts that his defense was antagonistic to that of the codefendant. Additionally he argues the evidence was insufficient to support his convictions, that he was denied a fair trial by the erroneous admission and exclusion of evidence, that he was prejudiced by prosecutorial misconduct, and that the court gave an incomplete jury instruction on circumstantial evidence. We agree that the defendant's trial should have been severed from Olinger's, and it will not be necessary to discuss other questions.

There is, of course, no question that before trial a defendant may request a severance if it appears that he will be prejudiced by a joinder of related prosecutions or defendants. (Ill. Rev. Stat. 1981, ch. 38, par. 114—8.) The pretrial motion must show the prejudice the defendant would suffer; a mere apprehension of prejudice is insufficient. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541; *People v. Lee* (1981), 87 Ill. 2d 182, 186.) The decision to grant a severance rests in the sound discretion of the trial court and will not be reversed absent an abuse of discretion. (*People v. Lee* (1981), 87 Ill. 2d 182, 186; *People v. Canaday* (1971), 49 Ill. 2d 416, 424.) Generally, defendants jointly indicted are to be tried together unless the circumstances are such that a defendant will be deprived of a fair trial if there is a joint trial. *People v. Daugherty* (1984), 102 Ill. 2d 533, 541; *People v. Lee* (1981), 87 Ill. 2d 182, 187; *People v. Clark* (1959), 17 Ill. 2d 486, 489-90.

The defendant first maintains that the counts charging him with murder, armed robbery, armed violence and conspiracy in the death of Adams were not sufficiently related to the counts charging him with the same offenses in the deaths of Stevens and Bushman to be joined in the same indictment. The legislature has provided that "[t]wo or more offenses may be charged in the same indictment \*\*\* in a separate count for each of-

fense if the offenses charged *** are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." (Ill. Rev. Stat. 1981, ch. 38, par. 111—4(a).) There are no precise criteria to determine whether separate offenses are part of the "same 'comprehensive transaction'" (*People v. White* (1984), 129 Ill. App. 3d 308, 315; *People v. Sockwell* (1977), 55 Ill. App. 3d 174, 175), but the appellate court has stated that important factors to be considered under a severance motion are the proximity in time and location of the offenses, the identity of evidence needed to demonstrate a link between the offenses, whether there was a common method in the offenses, and whether the same or similar evidence would establish the elements of the offenses. *People v. Thiele* (1983), 114 Ill. App. 3d 189, 195-96; *People v. Freeland* (1981), 103 Ill. App. 3d 94, 98; *People v. Mikel* (1979), 73 Ill. App. 3d 21, 27.

We consider that the offenses here may be said to be part of the same comprehensive transaction as contemplated by the legislature. It is true that the time of death of the victim could not be specified through expert testimony, but the pathologists were able to state that the three deaths occurred during the same 12-hour period. The defendant points out that Adams died from a "cutting wound" in the neck while Stevens and Bushman each died from a single shot in the head. The different causes of death, he says, refute any notion of common method in the offenses. Yet this is perhaps explainable, it is suggested, by the assailant's wish to extract from Adams the location of his cocaine and money before killing him. The evidence that there were superficial "torture" wounds on his neck and trauma to his head supports the theory that efforts were made to compel the information. And contrariwise, the assailant may have wanted to kill Stevens and Bushman as quickly and uneventfully as possible.

The State has identified evidence providing a link between the offenses. Duncan placed four telephone calls to Adams in the hours preceding his death in what the State said was an effort to lure him home. It was shown that Duncan was acquainted with a source of drugs in Kansas City and that Olinger was aware of Duncan's involvement with drugs. Further, we conclude that the evidence against the defendant was probative, through a theory of accountability, of the elements of murder, armed robbery and armed violence, and that it was probative of the elements of conspiracy.

The defendant's claim of serious error goes beyond the contention that the offenses were unrelated; he challenges the trial court's refusal to grant a severance on additional grounds.

This court has held that in joint trials there is a denial of the constitutional right to confrontation when a codefendant's statement inculpating the defendant is used against him, and a denial of the right to a fair trial if there are antagonistic defenses among defendants. (See *People v. Bean* (1985), 109 Ill. 2d 80, 93; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42.) The defendant invokes these grounds in arguing for a reversal of his conviction.

In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Supreme Court held that a codefendant's out-of-court statement which inculpated the defendant was inadmissible against that defendant as a denial of his constitutional right to confrontation. Further, the court declared that the prejudice that results from the admission of the statement is not cured by instructing the jury that the statement should be disregarded in deciding the guilt or innocence of the defendant. This is because, the court said, a limiting instruction is an inadequate substitute for the right to cross-examine. (391 U.S. 123, 137, 20 L. Ed. 2d 476,

485, 88 S. Ct. 1620, 1628; see also *People v. Miller* (1968), 40 Ill. 2d 154, 158-59; *People v. Clark* (1959), 17 Ill. 2d 486, 492.) The defendant contends that Stadler's testimony concerning Olinger's statement proposing to take over the sale of illegal drugs in the area was demonstrative of Olinger's involvement in the murders, but would be improperly considered against him by the jury. He similarly argues, too, that it was prejudicial to allow Patricia Doyle to testify to Olinger's statement that Adams had left all of his cocaine at Stralow's house because it tends to show that Olinger saw the victim at the critical time after he left the house but before his murder. The defendant says that, realistically, the jury considered this testimony against him despite the court's admonition to the jury to consider the statement only against Olinger.

We must consider whether the challenged statements sufficiently implicate the defendant in the crimes to warrant examination under *Bruton*. A codefendant's confession or admission does not have to expressly state that a defendant was involved in an offense; it is enough if incriminating implications clearly point to the defendant's guilt. (*People v. Serritello* (1944), 385 Ill. 554, 558; *People v. McVay* (1981), 98 Ill. App. 3d 708, 716.) In evaluating incriminating implications, it is proper to consider the statement in light of the State's other evidence against the defendant. *People v. Ross* (1968), 41 Ill. 2d 445, 462; *People v. Clark* (1959), 17 Ill. 2d 486, 491-92.

Stalder told the jury that Olinger was eager to take over the drug trade in the area and that he was willing to rob and kill those presently involved in the trafficking of illegal drugs to accomplish his intention. The State sought to convince the jury that, after Stalder refused his offer, Olinger entered into a similar deal with Stevens. However, the State theorized that Olinger realized the benefit of conspiring with Duncan when he met

the defendant at Adams' house. The State introduced evidence that Duncan was acquainted with an important source of drugs in Kansas City and could obtain substantial amounts of drugs on short notice; that he had had an argument with Adams over drugs, which Olinger witnessed, the night of the murder; that he was alone with Olinger in Adams' kitchen for hours on the night of the murders; and that he spoke to Adams four times on the telephone in what the State said was an effort to lure him home. We note that the record does not disclose direct evidence against the defendant. Stalder's testimony, when considered with the other evidence against the defendant, may reasonably be said to implicate Duncan in Olinger's plan to take over, by murder, if necessary, the drug trade in the area. Duncan should have had the opportunity to cross-examine Olinger in order to refute the inference that the defendant was offered, and accepted, a partnership in the local drug trade. The fact that Olinger did not testify deprived the defendant of his constitutional right to confrontation, and we conclude that fundamental fairness requires that the defendant be given a new trial. See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

We do not consider Doyle's testimony to be of the incriminating type forbidden by *Bruton*. Her testimony that Olinger was told by Adams that all of the cocaine was left at Stralow's was, of course, damaging to Olinger. Yet nothing in the statement infers that Duncan was with Olinger when he had the conversation with Adams, nor does the statement, when considered with the State's other evidence, lead to the inference that Duncan was present. Therefore we discount the conclusion asserted by the defendant that Doyle's testimony improperly convinced the jury of his guilt. *People v. Hudson* (1970), 46 Ill. 2d 177, 196.

We agree with the appellate court that "the evidence

supports a finding of guilt beyond a reasonable doubt." 133 Ill. App. 3d 489, 495.

Accordingly, the judgments against the defendant are reversed, and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*