(No. 62199.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM DUNCAN, Appellant.

*Opinion filed October 20, 1988.*

Ramsey Clark, Lawrence W. Schilling and Peter B. Meadow, of New York, New York, and Louis F. Pignatelli, of Rock Falls, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Terence M. Madsen and David E. Bindi, Assistant Attorneys Gen-

eral, of Chicago, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

On remand, we are again asked to decide whether the trial of defendant, William Duncan, should have been severed from that of his codefendant, Perry Olinger, because testimony about statements by Olinger was admitted although Olinger himself did not testify and thus was not subject to cross-examination regarding the statements. We hold that severance should have been ordered.

Relying partly on *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, this court previously reversed defendant's convictions and remanded for a new trial. (*People v. Duncan* (1987), 115 Ill. 2d 429.) After the decision was filed, the case of *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702, was decided, which resulted in a limiting interpretation of *Bruton*. Thereafter, the Supreme Court of the United States granted the People's petition for a writ of *certiorari*, vacated our judgment, and remanded this cause to us for further consideration in light of *Richardson*. (*Illinois v. Duncan* (1987), ___ U.S. ___, 98 L. Ed. 2d 18, 108 S. Ct. 53.) Such a remand may present us with a suggestion of the Court's tentative views but affords us ample opportunity to demonstrate why our original disposition was proper. See R. Stern, E. Gressman & S. Shapiro, Supreme Court Practice §5.12, at 277, 279-80 (6th ed. 1986); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice & Procedure §4021, at 689-91 (1977), at 566-67 (Supp. 1987); Hellman, *"Granted, Vacated, and Remanded"— Shedding Light on a Dark Corner of Supreme Court Practice*, 67 Judicature 389 (1984).

Upon further consideration, we adhere to our previous views, again reversing and remanding for the reasons that follow. We briefly again set out the facts of the case that underlie our reasoning. They are more fully summarized in our original opinion (115 Ill. 2d 429).

## FACTS

Defendant was indicted with Olinger in the circuit court of Whiteside County for crimes of murder, armed robbery, armed violence, and conspiracy (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1, 18—2, 33A—2, 8—2). A jury found the defendants guilty on all counts. Defendant Duncan was sentenced to life imprisonment on the murder counts and 10 years' imprisonment for armed robbery. The circuit court vacated his other convictions. (Olinger was sentenced to death, and we affirmed on direct appeal in *People v. Olinger* (1986), 112 Ill. 2d 324, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329.)

At the joint trial, Olinger did not testify. Defendant complains that two witnesses' testimony regarding alleged out-of-court statements by Olinger, though properly inculpatory of Olinger, had the effect of inculpating defendant as well because the jury was likely to consider the testimony improperly against him.

The first attribution of statements to Olinger, and their context, occurred as follows.

A witness, Edward Stalder, testified that two nights before the murders, Olinger had approached him about combining to take over the illegal drug traffic in the local area. According to Stalder, Olinger had proposed that in order to seize control of the traffic, they should steal drugs and money from "Jim Adams and a Bill" and "make sure there wasn't [*sic*] any witnesses left." (One of the subsequent murder victims was James Adams, and it was in Adams' house that defendant, Wil-

liam Duncan, was found apparently asleep when Adams' body was discovered.) Stalder also testified that Olinger later repeated his proposal for taking over the drug traffic and that Olinger said that he would obtain the required drug stock from someone who would bring it back from Kansas City.

There was substantial testimony that defendant and Adams had jointly engaged in illegal drug traffic and had purchased drugs from a Kansas City dealer with whom defendant was acquainted. Defendant and two other witnesses also testified that Olinger spent time with defendant in Adams' house on the night of the murder, both while Adams was on the premises and later while Adams was away to sell some drugs at the residence of Randolph Stralow. Stralow testified that Adams received four telephone calls from defendant while Adams was at Stralow's house; on the basis of Adams' alleged report of their contents and reaction to them, the People were later to argue that the calls constituted an attempt to lure Adams home, where he could be killed. Defendant testified that he and Adams had been awake for three days and that, several hours after Adams left for Stralow's residence, defendant took a sedative to bring on sleep, and the next thing he knew was when Adams' friend Tina Taber awakened him to tell him that something was wrong with Adams, whose body was lying on his kitchen floor.

It was the People's trial theory that, after Stalder declined Olinger's proposal, Olinger made the desired deal with another murder victim, Gordon Stevens, then realized upon talking with defendant at Adams' house that he could make a better deal with defendant; did so; murdered Stevens (and the woman with whom he lived) to terminate the first deal; and then, with defendant as his accomplice, murdered Adams when Adams returned

to his house, where Olinger and defendant were waiting.

The second attribution of a statement to Olinger came when a witness, Patty Doyle, testified that Olinger had told her that Adams had told him that Adams had left all of Adams' cocaine at the Stralow residence. Since there was testimony that Adams was at the Stralow residence immediately before returning home and being murdered, this tended to show that Olinger, who was placed by testimony at Adams' residence at least while Adams was away, had remained at the Adams residence and had talked with Adams upon the latter's return.

Earlier in Stalder's testimony, the court had instructed the jury not to consider Olinger's out-of-court statements against defendant. However, the instruction was not repeated when Stalder actually testified as to the Olinger statements about a proposal to take over drug traffic.

When Doyle testified about Olinger's statement that Adams had said he had left the cocaine at Stralow's residence, counsel for both defendants objected on hearsay grounds. The court overruled the objection but instructed the jury to consider the statement only in connection with Olinger's guilt or innocence but not as to defendant.

## OPINION

In our previous opinion (115 Ill. 2d at 443-44), we considered whether the Olinger statements to which Stalder and Doyle testified were sufficiently inculpatory of defendant to warrant examination under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. We concluded (1) that the statements to which Stalder testified, about a plan to take over the drug traffic, were so inculpatory of defendant, in light of the People's other evidence and of their own implica-

tions, that their production at defendant's trial, without an opportunity for him to cross-examine their alleged maker as to whether defendant had conspired with the maker to control the drug traffic, violated defendant's constitutional right of confrontation and (2) that fundamental fairness required a new trial of defendant. To support our conclusion, we cited *Bruton*. However, we found that Doyle's testimony about the cocaine's having been left at Stralow's house was not forbidden by *Bruton*, since even when considered with the other evidence it did not implicate defendant. 115 Ill. 2d at 444.

### A. *Bruton* and *Richardson*

Although it is often reasonable to assume that a jury has followed a trial judge's limiting instructions regarding evidence admitted for one purpose but not for another, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.]" (*Bruton*, 391 U.S. at 135, 20 L. Ed. 2d at 485, 88 S. Ct. at 1627.) *Bruton* thus could not "accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination" in a case where a nontestifying codefendant's "powerfully incriminating extrajudicial statements" of doubtful credibility were introduced in a joint trial, even though the jury was instructed to disregard the statements in determining the defendant's guilt or innocence. *Bruton*, 391 U.S. at 124-25, 135-37, 20 L. Ed. 2d at 478-79, 485, 88 S. Ct. at 1621-22, 1628.

*Bruton* has now been given new meaning by the decision in *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702. In *Richardson*, the Court held that a defendant's Federal constitutional right of confrontation (U.S. Const., amends. VI, XIV) is not vio-

lated by the use at a joint trial of a nontestifying codefendant's confession, although the defendant is linked to the confession by other evidence, when the confession is redacted to eliminate even anonymous references to the defendant and when the jury is properly instructed not to use the confession against the defendant. *Richardson*, 481 U.S. at 211, 95 L. Ed. 2d at 188, 107 S. Ct. at 1709.

Fundamental to the Court majority's reasoning in *Richardson* was its view that, whereas *Bruton* teaches that a jury cannot be assumed to have obeyed its instructions and disregarded a "powerfully incriminating" codefendant's confession that expressly implicates a defendant, a different situation is presented when the codefendant's confession does not intrinsically incriminate the defendant. (*Richardson*, 481 U.S. at 208, 95 L. Ed. 2d at 186, 107 S. Ct. at 1707.) The *Richardson* majority felt that, even though inferences may be created by extrinsic evidence that links the defendant with the confession, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction" and, "while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule." *Richardson*, 481 U.S. at 208, 95 L. Ed. 2d at 186, 107 S. Ct. at 1707-08.

In order to reconsider our previous opinion in light of *Richardson*, we initially inquire whether the facts of this case bring it within the terms of *Richardson*'s newly announced refinement of the *Bruton* rule. We conclude that they do not.

First, there was no redaction whatever of the statements attributed by Stalder to Olinger and admitted into evidence during the joint trial of Olinger and defendant.

Indeed, redaction would have been difficult, since evidence of the statements was found solely in the trial testimony of Stalder, who was not a police officer but an admitted criminal himself, and the statements apparently had never been reduced to writing prior to trial. Under these circumstances, procuring admissibility through attempts at redaction is a chancy enterprise that has been much criticized. (See *Bruton*, 391 U.S. at 134 n.10, 20 L. Ed. 2d at 484 n.10, 88 S. Ct. at 1626 n.10; *People v. Cruz* (1988), 121 Ill. 2d 321, 330.) This fact, however, while serving to set our case apart from *Richardson*, might not by itself constitute a weighty distinction if there were nothing worthy of redaction.

Second, and more telling, one of the statements attributed to Olinger named one of the murder victims and "Bill" as being the two persons who stood in the way of a takeover by Olinger of the local drug traffic. It was that very victim with whom defendant, bearing the given name William, had jointly engaged in unlawful drug traffic. Another statement attributed to Olinger was that he would procure drugs from someone who would bring them from Kansas City; other testimony showed defendant to be acquainted with a Kansas City drug dealer and to have participated with the victim Adams in bringing drugs back from the dealer.

In view of these facts, at least the first statement differed from what was found acceptable in *Richardson*, since, particularly in the context of other trial evidence, it not only failed to eliminate "any reference" to defendant's existence but also could reasonably be construed (and is conceded by the People) to name defendant specifically through its reference to "Bill" as the victim's associate in drug dealing. (See *Richardson*, 481 U.S. at 211, 95 L. Ed. 2d at 188, 107 S. Ct. at 1709.) The *Richardson* Court expressly refrained from approving the use at trial of codefendants' confessions that, as re-

dacted, name defendants only by symbols or neutral pronouns (*Richardson*, 481 U.S. at 211 n.5, 95 L. Ed. 2d at 188 n.5, 107 S. Ct. at 1709 n.5; *People v. Hernandez* (1988), 121 Ill. 2d 293, 313); *a fortiori*, admissions naming defendants by their actual nicknames are not permitted. Accordingly, the impropriety of admitting into evidence the Stalder testimony about Olinger's statement regarding Jim Adams and "Bill" was not relieved by *Richardson* from the full force of *Bruton*'s disapproval.

Even the second statement to which Stalder testified, about obtaining drugs from a Kansas City courier, though arguably incriminating defendant only by inference and thus permissible under *Richardson*, differed significantly from the evidence found acceptable in *Richardson*. In *Richardson*, the codefendant's redacted statement made no reference whatever to the defendant's existence and it was she alone whose testimony placed herself in the codefendant's company, whereas here the codefendant's statement referred to "someone—I don't know who it was that was going to Kansas City to bring back cocaine and marijuana," thus directly affirming the existence of a Kansas City courier who then might be identified with defendant by the force of other testimony.

The People argue that the statement naming the victim and "Bill" does not incriminate defendant even though, as the People acknowledge, it refers to him by name, because it is not a confession but rather an expression of intent by Olinger to victimize defendant and, as such, tends to exculpate rather than incriminate defendant. Without pursuing this point extensively, the People then argue that, in any event, the real issue is whether the limiting jury instructions adequately protected defendant from misuse against him of Olinger's statement.

Before assessing the adequacy of the instructions to which the People refer, we wish to observe that, as defendant notes in his supplemental reply brief on remand, his situation with respect to the statement about "Bill" falls "someplace between those two end points of the spectrum" represented by a codefendant's confession explicitly naming a defendant (*Bruton*) and one that, as redacted, makes no reference at all to a defendant (*Richardson*). (See *People v. Cruz* (1988), 121 Ill. 2d 321, 330.) As we noted in our earlier opinion in this cause, for its use at a joint trial to be weighed against a defendant's rights to confrontation, a codefendant's "confession or admission" need not expressly state that a defendant was involved in an offense; it is sufficient that it clearly imply the defendant's guilt when considered in light of other evidence against the defendant. *People v. Duncan* (1987), 115 Ill. 2d 429, 443 (and cases cited therein).

Here, though Olinger's statement bespoke intent rather than accomplishment in relation to certain crimes, that fact is purely academic and his statement was nonetheless a "confession or admission"—the more so since the solicitation that it constituted would itself have been a crime, of which intent was an element (see Ill. Rev. Stat. 1981, ch. 38, par. 8—1). In its evidentiary context, the statement tended ultimately to incriminate defendant because, as the jury was urged to believe, it tended to show that Olinger was seeking a confederate and found one in defendant after having had a chance to spend some hours with defendant and observe the advantages of combining with him rather than robbing or killing him. Thus, although Olinger's naked statement ostensibly involved an effort to victimize rather than conspire with defendant, it is proper for us to examine it in light both of *Bruton* and *Richardson* and of

our own precedents regarding nontestifying codefendants' statements.

If such a statement were otherwise admissible under the rule of *Richardson,* a "proper limiting instruction" would still be required. (*Richardson,* 481 U.S. at 211, 95 L. Ed. 2d at 188, 107 S. Ct. at 1709.) Here, not only was the limiting instruction somewhat removed in time from the Stalder testimony about Olinger's effort to obtain a confederate to take over drug traffic, but its mandate was overlooked even by the prosecution in closing jury argument and by the People in briefing this court. The People's supplemental brief on remand describes Olinger's wish to join with a confederate and take over the drug traffic as being one link in a chain of circumstantial evidence showing defendant's guilt; yet the evidence of such a desire on Olinger's part was Stalder's testimony that Olinger had made such statements, and under the trial court's instructions the testimony was to be considered against Olinger only, not against defendant. Indeed, the appellate court itself appears to have considered the same Stalder testimony as evidence of defendant's guilt. See 133 Ill. App. 3d 489, 494.

Under these circumstances, we do not believe that the trial court's instructions in the case at bar clearly directed the jury not to consider as part of the case against defendant the testimony by Stalder either about Olinger's statement naming Jim Adams and "Bill" or about Olinger's statement regarding a Kansas City drug courier.

The very fact that, given the interwoven nature of the prosecution's case, it might be quite difficult adequately to impart proper limiting instructions supports our view that the trial court erred in failing to sever defendant's trial from Olinger's. The People argue that we should not force upon trial courts a "costly and un-

workable" choice of severing trials whenever evidence against one defendant might tend to implicate another, of completely pretrying a case to determine whether such implication would occur, or of reaching such a determination and granting a new trial only after the first trial was largely completed. (*Cf. Richardson*, 481 U.S. at 209, 95 L. Ed. 2d at 187, 107 S. Ct. at 1708-09.) "On the scales of justice, however, considerations of fairness normally outweigh administrative concerns" (*Richardson*, 481 U.S. at 217, 95 L. Ed. 2d at 192, 107 S. Ct. at 1712 (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.)), and in any event, as we point out *infra*, the Illinois courts have long held that a choice must be made between severance, nonuse of a nontestifying codefendant's admissions, or redaction to eliminate all reference to the implicated defendant (*e.g., People v. Patris* (1935), 360 Ill. 596, 601).

## B. Prior Illinois Law

The development of our own State's law on nontestifying codefendants' admissions fortifies our decision in this case. Though in our prior opinion (115 Ill. 2d at 442-44) we cited and discussed *Bruton*, we also specifically cited *People v. Miller* (1968), 40 Ill. 2d 154, 158-59, *cert. denied* (1968), 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401, and *People v. Clark* (1959), 17 Ill. 2d 486, 492. *Miller* likewise cited *Bruton* parenthetically (*Miller*, 40 Ill. 2d at 159), but only in conjunction with citations to *Clark* and *People v. Smuk* (1957), 12 Ill. 2d 360, to both of which latter cases *Miller* devoted more attention. *Clark*, in turn, cited *People v. Johnson* (1958), 13 Ill. 2d 619, *People v. Hodson* (1950), 406 Ill. 328, *People v. Barbaro* (1946), 395 Ill. 264, and *People v. Patris* (1935), 360 Ill. 596.

This line of Illinois cases is traceable at least to *People v. Buckminster* (1916), 274 Ill. 435, which reversed a

conviction when a nontestifying codefendant's confession implicating the defendant had been admitted into evidence, although with a limiting instruction. The *Buckminster* court cited to English and Canadian cases and treatises, as well as our own previous opinions, in support of its holding; and *Buckminster*'s antecedent cases, as well as its progeny, have usually adverted to such values as the plainest principles of justice or not working an injustice (see *Patris*, 360 Ill. at 601; *People v. Sweetin* (1927), 325 Ill. 245, 252; *Rex v. Martin* (Ont. App. 1905), 9 O.L.R. 218, 228 (Osler, J.A., concurring); *The Queen v. Weir* (Que. Q.B. 1899), 3 C.C.C. 351, 352), or ensuring a fair trial and avoiding harmful prejudice (*Clark*, 17 Ill. 2d at 490, 492; *Johnson*, 13 Ill. 2d at 624-25; *Barbaro*, 395 Ill. at 270-71; *People v. Rupert* (1925), 316 Ill. 38, 46).

While this court's opinions in prior cases have analyzed the use of confessions and of admissions rather interchangeably (see, *e.g., Rupert*, 316 Ill. at 44-45) and have often remained silent as to the precise doctrinal basis for decision, it is clear that the Illinois courts have for about a century warily approached the admissibility of nontestifying codefendants' statements and have done so quite independently of the Federal constitutional doctrine underlying both *Bruton* and *Richardson*. The People contend that the *Buckminster* rule and its reasoning make that case indistinguishable from *Bruton* and that Illinois law merely tracks the *Bruton* rule as construed in *Richardson*. However, from early times, Illinois case law has evolved without reliance on the sixth amendment to the Federal Constitution as in *Bruton* and has made the oft-repeated observation, grounded simply in fairness, that the incrimination of a defendant by admission into evidence of a nontestifying codefendant's statements incompetent against the defendant, even when the jury is given a limiting instruction, is "very damaging"

to the first defendant because "it is very difficult for a juror to divest himself, under instructions, from the illegitimate effect of such evidence." *White v. People* (1876), 81 Ill. 333, 338; accord *People v. Buckminster* (1916), 274 Ill. 435, 444-45; *People v. Sweetin* (1927), 325 Ill. 245, 252; *People v. Johnson* (1958), 13 Ill. 2d 619, 624, citing *People v. Skelly* (1951), 409 Ill. 613, 621; *People v. Clark* (1959), 17 Ill. 2d 486, 491, 492.

Unless some other exception to the hearsay rule applied, we have allowed admission of such statements at joint trials only reluctantly, only with proper limiting instructions, and only if the statements are cleansed of *all references* to a nondeclaring defendant. (See *Clark*, 17 Ill. 2d at 490.) This redaction manifestly was not performed in the case at bar, where an express reference to "Bill" meant defendant and was exposed to the jury, and where the jury also heard a reference to a Kansas City courier that in light of other testimony it might reasonably construe to mean defendant.

Rarely have our decisions on this general subject felt it necessary to cite constitutional law as authority, and when they have done so it is evident from their choice of language that they were referring to the Illinois rather than the Federal Constitution. (*E.g.*, *People v. Colegrove* (1930), 342 Ill. 430, 438-39 (citing *People v. Schallman* (1916), 273 Ill. 564, 569), cited in *People v. Smuk* (1957), 12 Ill. 2d 360, 365 (involving admission against defendant of out-of-court statements of others); see Ill. Const. 1870, art. II, §9.) Indeed, it would have been surprising had our early court professed to base its rule on the Federal Constitution's sixth amendment, since it was not until 1965 that that amendment's guaranty of the right of confrontation was authoritatively held to be obligatory on the States by virtue of the fourteenth amendment. See *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065.

In any event, and regardless of any degree to which the Illinois Constitution's right of confrontation may be incongruent with the Federal Constitution's, we need not find our long-established Illinois rule to be based expressly on the Illinois Constitution in order for the rule to serve in the case at bar as an adequate ground of decision, independent of the Federal constitutional doctrine recognized in *Bruton* and *Richardson*. (See *Michigan v. Long* (1983), 463 U.S. 1032, 1037-44, 77 L. Ed. 2d 1201, 1212-16, 103 S. Ct. 3469, 3474-78; 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice & Procedure §4021 (1977 & Supp. 1987).) Our rule has sufficient basis in the inherent authority of our courts to announce the law of evidence for the assurance of fair trials (see *Strukoff v. Strukoff* (1979), 76 Ill. 2d 53; *People v. Jackson* (1977), 69 Ill. 2d 252; *People v. Callopy* (1934), 358 Ill. 11) and in the long-expressed concern of our and of other Anglo-American courts that, with limited exceptions, defendants should not be prejudiced by the admission of incriminating extrajudicial statements of nontestifying codefendants.

In sum, therefore, upon reconsideration in light of *Richardson*, this case does not present facts sufficient under *Richardson* for the admission at a joint trial of the extrajudicial statements to which Stalder testified. In addition, the admission of such statements at a joint trial, absent a total deletion of all references to defendant, violated established Illinois case law that is independent of *Bruton-Richardson* constitutional doctrine. For these reasons, we adhere to our former disposition of this cause, reverse the judgments of the appellate and circuit courts against defendant, and remand the cause to the circuit court of Whiteside County for a new trial. It is thus unnecessary for us to rule on the People's motion, which we took with the case, to strike portions of defendant's supplemental brief on remand

that pertain to issues uninvolved in the remand order. We also need not reach the other issues raised by the parties.

*Appellate court reversed; circuit court reversed; cause remanded.*

JUSTICE MILLER, specially concurring:

I concur in the majority's decision to reverse the defendant's convictions and remand the cause for a new trial. But I do not join part B of the opinion, which purports to find a basis in State law for the decision in this case. The majority's efforts to establish an adequate and independent State ground for the decision in this case are unnecessary, and for that reason I write separately.

I agree with the majority that the introduction of the nontestifying codefendant's statements into evidence at the joint trial had the effect of violating the Federal confrontation right of the defendant, William Duncan. As part A of the majority opinion demonstrates, that result is consistent with the Federal law developed by the Supreme Court in the line of cases beginning with *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, and culminating in its recent decision in *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702. Because Federal law provides a sufficient answer to the defendant's claims and the controversy may be disposed of on that ground alone, it is not necessary in this case to determine whether State law provides greater protection. State law could not compel a different result in this case, and therefore we need not consider here the defendant's alternative argument that a new trial is necessary as a matter of State law alone.

The majority is certainly correct in finding in the decisions of this court an early precursor of the principle that

was recognized in *Bruton.* Indeed, the *Bruton* court included an Illinois decision, *People v. Barbaro* (1946), 395 Ill. 264, among the group of State court cases that had considered the efficacy of jury instructions in eliminating the prejudice to a defendant that arises from the use at a joint trial of a nontestifying codefendant's inculpatory statements. (*Bruton,* 391 U.S. at 129 n.4, 20 L. Ed. 2d at 481 n.4, 88 S. Ct. at 1624 n.4.) But in our earlier opinion in this case, we made no pretense of basing our decision on State law. In its eagerness to establish a State-law genealogy for the decision here, the majority overlooks the clear statements in our earlier opinion, in which we said, "We must consider whether the challenged statements sufficiently implicate the defendant in the crimes to warrant examination under *Bruton.*" (*People v. Duncan* (1987), 115 Ill. 2d 429, 443.) We then discussed Stalder's testimony regarding codefendant Olinger's interest in obtaining control over the illicit drug trade in the locality. Citing only *Bruton,* we held, "The fact that Olinger did not testify deprived the defendant of his constitutional right to confrontation, and we conclude that fundamental fairness requires that the defendant be given a new trial." *Duncan,* 115 Ill. 2d at 444.

Clearly, then, our earlier decision in this case relied on Federal rather than State constitutional law, and that was also the understanding of the Supreme Court, which remanded the case to us for reconsideration in light of its intervening decision in *Richardson,* a decision under Federal constitutional law. Having in our original opinion and now determined that a new trial is mandated under Federal law, we have no occasion to consider the separate question whether the same result is required independently by State law. I would limit our disposition in this case accordingly.

MORAN, C.J., joins in this special concurrence.