THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVE D. PECINA, Defendant-Appellant.

Third District    No. 3—83—0461

Opinion filed April 26, 1985.

Robert Agostinelli and Peter A. Carusona, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Patricia Hartmann, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Defendant Steve Pecina and his brother, codefendant Florencio Pecina, were charged with the murder and robbery of Arthur Zielinski, tried jointly by a jury, found guilty of all charges, but convicted of felony-murder only, and sentenced to terms of imprisonment of natural life and 60 years, respectively, by the circuit court of Will County.

The issues raised in this appeal are: (1) whether the defendant was deprived of a fair trial when the trial court denied defense challenges for cause and a request for additional peremptory challenges during jury selection; (2) whether the trial court erred in refusing a defense-tendered jury instruction on voluntary manslaughter; (3) whether the prosecutor's closing argument deprived the defendant of a fair trial; (4) whether the trial court erred or abused its discretion in sentencing the defendant to natural life imprisonment; and (5) whether the State failed to prove defendant guilty of robbery beyond a reasonable doubt.

At trial, the defendants' pretrial statements were introduced by the prosecution, and each defendant testified on his own behalf concerning the events culminating in the victim's death on the night of November 3, 1982.

The defendants' statements and testimony, although not entirely consistent, tended to establish that Steve and a person identified only as "Jose" approached Florencio and asked him to drive them to a restaurant in Romeoville where Steve had been employed as a dishwasher. (Apparently, Steve had quit his job the previous weekend, had been in some minor trouble, and had just been released from police custody at the time of the events of November 3, 1982.) The restaurant owner purportedly owed Steve about $120 in wages, and Steve wanted to see about getting his job back.

Florencio agreed to provide the transportation and the three men proceeded in Florencio's car to the restaurant. Prior to the drive, Steve had been drinking beer; and he may have been sniffing paint in the car with Jose. At the restaurant, Steve received a partial payment of his wages—$20—and was told by the owner that Arthur Zielinski, Steve's former landlord, was looking for him because Steve owed Zielinski rent money. Steve denied that he owed Zielinski anything but said he would go to see him.

The men next drove to Zielinski's home at 405 Montrose in Romeoville. Florencio had never been introduced to Zielinski previously, but all three men were invited inside, where they drank beer and whiskey, conversed, and played a drinking game. The can of spray paint and the plastic bag used for sniffing it were brought from the car into the house, but the host, Zielinski, instructed the men not to sniff paint in his home. Eventually the men finished off the beer in the house, and Zielinski gave Steve money to buy more. Florencio drove Steve to a nearby Osco Drug store, where Steve purchased a case of Old Style beer. They returned to Zielinski's house, put the beer in the freezer and continued drinking. Testimony concerning

Jose's whereabouts at this point was conflicting—Florencio and Steve indicating Jose stayed at Zielinski's house, and the assistant manager at the drug store indicating there were three Mexican gentlemen who purchased Old Style, one of whom was Steve.

Zielinski showed the men some wine decanters he was collecting and took Florencio to the garage to look at Zielinski's black 1976 Lincoln Continental. According to Florencio, while there, Zielinski offered him money, clothes and the use of the Lincoln Continental if Florencio would sleep with Zielinski. The proposition angered Florencio. He threw a beer can into the car, told Zielinski to "get fucked" and went back inside the house. Steve asked what was wrong, and Florencio said Zielinski had made a pass. Zielinski retreated to his bedroom, and Steve pursued. An argument developed between Steve and Zielinski, and then Florencio joined them. A pushing/shoving match ensued and blows were exchanged, but no serious injuries resulted during this encounter. Both Pecina brothers and Zielinski returned to the living room area to continue drinking. Zielinski persisted in trying to talk with Florencio, but Florencio ignored him. Finally, Zielinski got mad and went back to his bedroom.

Steve pursued Zielinski again to the bedroom, and another fight broke out. Florencio's testimony was that he heard a loud crack and went back to see what was going on. Steve was wielding a broken wine decanter. There was blood all over the bedroom, and Zielinski was not moving. Florencio tried to pull Steve off Zielinski's body, but Steve turned on Florencio with a wild look. Florencio grabbed a knife, but then let it drop. He then retrieved the can of spray paint and attempted to cover up places throughout the house that he had touched. He also printed "L/K" on Zielinski's body and on the walls of the house in an attempt to mislead the police into believing that the murder had been the work of the "Latin Kings" gang. Florencio fled from the scene alone in his car. The testimony was unclear as to when or how Jose left the house. He was not implicated in the killing.

Steve, a chronic alcoholic with memory lapses, awoke the next day in an alley. He recalled biting Zielinski's ear and slicing it off with glass from the broken decanter. After slitting Zielinski's throat, Steve recalled his brother coming into the room and trying to pull Steve off the victim. According to Steve's testimony, his violence was sparked by Zielinski's sexual advances toward Florencio and then fueled by Zielinski's threat to harm Steve after Steve hit Zielinski on the head with the wine decanter.

According to the defendants, Zielinski was clad only in his underwear and a T-shirt during the entire evening. Corroborating testi-

mony of Ronald Joseph Ortiz, who had also rented a room in Zielinski's house, tended to establish that the scant apparel was the victim's customary garb around the house. Zielinski had house rules that his renters not invite women into the house and that they not have wild parties on the premises. Steve stated that he knew Zielinski to be homosexual, Zielinski having previously admitted his preference to Steve.

The next day, November 4, 1982, Zielinski's body was discovered by Virginia Hoefke, the victim's ex-wife. Hoefke testified at trial that she had talked with her ex-husband briefly by telephone around 9 o'clock and again around 10 o'clock the evening of November 3, 1982. Although he customarily telephoned her at 6 a.m. to awaken her for work, she did not receive a call on November 4, and became concerned. Mrs. Hoefke drove over to the house, where she discovered initially that the garage door was open and that the black Lincoln Continental was not inside. She proceeded into the residence and through the rooms calling her ex-husband's name until finally she came upon the grisly scene in the master bedroom. Mrs. Hoefke immediately ran for help and called the police. The police arrived, sealed off the crime scene and took photographs, several of which were introduced into evidence at the defendants' trial. A wallet, identified as the victim's, was found in the toilet. It was devoid of money. Glasses, identified as belonging to the victim, were found lying on the victim's bedroom dresser. According to Hoefke, Zielinski's eyesight was bad. He never did anything without wearing his glasses, removing them only to go to bed. The victim's black Lincoln Continental was located on November 5, 1982, about six blocks from the Pecina residence in Joliet. Blood and urine samples extracted during an autopsy of Zielinski's body and tested on November 8, 1982, revealed an alcohol concentration between .095 and .121 percent.

Lastly, investigating officers testified that they had recovered $3.09 in change found lying on a bedside table in a guest bedroom in the house, and neither of the Pecina brothers confessed to any knowledge about how Zielinski's wallet came to rest in the toilet. Steve Pecina assumed that he had driven away from the murder scene in Zielinski's black Lincoln Continental. He testified that Zielinski kept the car keys on his bedroom dresser near the telephone. Romeoville police officer Larry Vinson testified that he had observed a vehicle matching the description of Zielinski's Lincoln Continental driving without its headlights illuminated in the vicinity of Zielinski's house around 11 p.m. on November 3. It appeared to the officer that the headlamps were turned on after the Lincoln passed the officer's

marked squad car, but Vinson was not certain on that point.

Steve Pecina was charged with murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (3)); robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—1) based on the taking of a wallet; and robbery based on the taking of an automobile.

For reasons that will become clear, we choose to consider initially defendant Steve's issues relating to whether he received a fair trial. Defendant's first argument asserts that the defense should have been granted additional peremptory challenges upon denial of challenges for cause with respect to two jurors.

█ The jury *voir dire* included inquiries into the panel members' attitudes towards insanity and intoxication defenses. All potential jurors with the exception of two men—Reginald Rych and Wayne Atwater—unhesitatingly agreed that they could keep an open mind with respect to the defenses. Both Rych and Atwater expressed initial reservations. Based on their equivocal responses, the defense attempted to challenge them for cause. The court then halted proceedings, called in a court reporter, and made a record of its admonitions that the jurors had to follow the law as instructed, keeping an open mind and setting aside personal beliefs. These two potential jurors responded to the court's specific inquiries with the result that both men assured the court that they would be able to follow the law. The court ultimately denied the challenges for cause. Since defense counsel had exhausted all of their peremptory challenges by the time eight jurors had been selected, the defense team requested additional peremptory challenges. This request was denied as well. Atwater was ultimately selected as the jury foreman. Defendants argue in this appeal that they were forced to accept the two jurors and were, because of their possible biases, denied the fundamental right to an impartial jury. We cannot agree.

The responses of jurors Atwater and Rych, while somewhat equivocal upon the court's initial general inquiry, were not such that it could be determined that the men could not be impartial. The trial court properly probed into the potential jurors' possible biases against the proposed defenses of insanity and intoxication by asking them whether they would be able to keep their minds open and follow the law to give the defendants a fair trial or whether their personal views were so strong that they would influence their decisions regardless of the evidence. The trial court was in a position to evaluate the jurors' responses and fairly decide their candor. Both men assured the court that they would determine the defendants' guilt or innocence based on the facts admitted at trial and the law as instructed, rather than

on their preconceived notions.

The trial court's determination of whether prospective jurors can give the accused a fair trial should not be set aside unless that determination was contrary to the manifest weight of the evidence. (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) The decision to grant challenges for cause or a request for additional peremptory challenges rests within the sound discretion of the trial court. Bias is not to be presumed in the situation at hand, and clearly was not finally demonstrated. Having reviewed the record thoroughly, we conclude that the trial court's denial of defendants' challenges for cause and their request for additional challenges based on the *voir dire* of Atwater and Rych was not improper.

The next issue we must address is whether the trial court improperly refused the defense-tendered jury instruction on voluntary manslaughter. In criminal law, the rule is well engrained that a defendant is entitled to instruction on any defense shown by the evidence. The court may not weigh the evidence to determine whether such instruction may be given. The defense in this case vigorously argued both at trial and on appeal that some evidence had been adduced at trial which could support a verdict finding the defendants guilty of voluntary manslaughter, rather than murder. While there was evidence tending to support the defenses of insanity and voluntary intoxication, we fail to find any evidence that would support the defendants' theory that Zielinski was killed as a consequence of Steve Pecina's sudden and intense passion resulting from serious provocation by the deceased. We hold that the trial court committed no error in refusing to instruct the jury on voluntary manslaughter.

Defendant next suggests that the prosecutor's closing argument contained prejudicial remarks impugning defense counsel, defendants' expert witness and the theories of defense presented at trial. Having reviewed the remarks complained of within the context of the closing arguments, we are satisfied that they did not operate to deny the defendants a fair trial. The trial court properly denied defendants' motions for a new trial on the basis of claimed prosecutorial misconduct.

The defendant also takes issue with imposition of a sentence of natural life. The trial court found that defendant's conduct was indicative of wanton cruelty, and the evidence supports that finding. Further, we cannot state that the trial court abused its discretion in imposing the very harsh sentence of natural life. However, because our resolution of the reasonable-doubt issue warrants a new sentencing hearing, we need comment no further on the severity of the

defendant's sentence as originally imposed.

■ Defendant contends that his conviction of felony murder cannot be sustained because he was not proved guilty of the predicate offense—robbery—beyond a reasonable doubt. On this point, we agree with the defendant.

At trial, the State's theory of the commission of robbery and felony murder was that Zielinski had retired for the night before one or both of the Pecina brothers went into the bedroom to take their host's money and automobile keys. Zielinski resisted and was murdered as a consequence. To sustain the felony murder conviction, it is fundamental that each element of the predicate offense—in this case, robbery—be proved beyond a reasonable doubt. The felonious-mental-state element of felony murder in this case is merely the general intent element inherent in the statutory offense of robbery. (See *People v. Banks* (1979), 75 Ill. 2d 383, 388 N.E.2d 1244.) The State was also required to prove, however, the gist of robbery—a taking by force or the threat of force. *People v. Banks* (1979), 75 Ill. 2d 383, 388 N.E.2d 1244.

Defense counsel for both defendants have strenuously objected throughout the trial and on appeal, contending that the State failed to prove that force or threat of force had been used against Zielinski for the purpose of making him relinquish his wallet and car. As was recently observed by our supreme court, an essential element of robbery is "that the robber use violence or fear of violence *as the means to take* property in the control of the victim." (Emphasis added.) (*People v. Tiller* (1982), 94 Ill. 2d 303, 316, 447 N.E.2d 174, 181.) Although the *Tiller* decision had not been presented to the trial court when it ruled in this case, we now have the benefit of our supreme court's reasoning in a factually analogous situation which merits our careful consideration.

In *Tiller*, evidence introduced at the trial indicated that Tiller, a companion, Andre Jones, and a cousin, Laurie Elem, set out on a walk one morning and decided to rob a man they observed at a brickyard along the way. The man was loading some bricks. The man, Mr. Staltz, was fatally wounded by a shot in the eye and relieved of his watch and keys. The trio continued their walk and decided to rob a dry cleaners. They entered and took clothing, curtains, a television set and money from the establishment, and inflicted upon the proprietor two fatal gunshot wounds to the skull. It appears that a mail truck, operated by postal employee Debra Brown, arrived on the scene during the course of the cleaners' robbery. Brown died from two gunshot wounds—one in the chest and the other in the mouth. The exact se-

quence of events culminating in Brown's death is unclear, since Elem, who gave the only eyewitness testimony for the State concerning the events immediately preceding the cleaners robbery, had gone home before her companions decided to rob the cleaners.

Tiller testified at trial on his own behalf. He stated that, in addition to drinking beer and a wine-like beverage during the morning stroll, he had ingested five pink pills of unknown composition and suffered some memory loss concerning the day's activities. He denied having direct responsibility for any of the three deaths and testified that he had instructed Jones not to hurt the "mail lady." Later, however, the defendant used the mail truck to facilitate removal of the television set from the cleaners to Elem's apartment. The defendant checked through the undelivered mail, located income tax refund checks, and presented a couple of them to his friend, Annette Simpson. According to Simpson, the defendant admitted to her that he had killed the "mail lady," but Simpson did not believe it. Later, the defendant abandoned the mail truck.

On defendant's motion, prosecution of the offenses against the brick loader was severed from the trial for offenses at the scene of the dry cleaners. A jury instructed, *inter alia*, on accountability and felony-murder found Tiller guilty of the murders, armed robberies and armed violence of Brown and the dry-cleaners proprietor, as charged. On appeal, the defendant contended that the State's evidence was insufficient to prove the armed robbery of Debra Brown. After setting forth the principles of law pertinent to the issue, the court stated:

> "It is not clear from the record what transpired in the cleaners, but there is no evidence to show that the force exerted against Miss Brown was for the purpose of depriving her of the mail truck or the mail in it. We conclude that the conviction for the armed robbery of Miss Brown must be reversed." (*People v. Tiller* (1982), 94 Ill. 2d 303, 316, 447 N.E.2d 174, 181.)

The court went on to reverse the defendant's conviction for the armed violence of Debra Brown on the grounds that reversal of the underlying felony—armed robbery—required such result. 94 Ill. 2d 303, 323, 447 N.E.2d 174, 184.

Subsequent to *Tiller*, our supreme court considered yet another armed robbery/murder case which the defendant has asked us to consider. *People v. Taylor* (1984), 101 Ill. 2d 508, 463 N.E.2d 705.

In *Taylor*, one occurrence witness, Ronald Howell, testified at trial that on March 7, 1979, he heard two shots while riding the elevator of an apartment complex. Upon arriving at the lobby, he found the victim, Freddie Lampton, lying near the stairs. Two acquaintances

were standing in the lobby. Howell advised one bystander, Steve Davis, to telephone the police and the other, Cynthia Cobb, who was hysterical, to leave the scene. Then Howell saw the defendant, Robert Taylor, emerge from "somewhere" and bend over Lampton's body. Howell testified that he thought he saw the defendant remove the victim's watch and take something from his pocket, but Howell was not sure. Taylor then pointed a big silver gun at Howell and told him not to move. Nonetheless, Howell made his escape and reported the incident to the police the next day.

Cobb's version of the events differed slightly. Cobb said she was in the complex lobby when she heard two men arguing and two gunshots. She ran from the building, but returned in a few minutes and observed an unidentified man with hands in his pockets walking quickly out of the building. Upon re-entering the lobby, Cobb saw Lampton's body lying near the stairs and Davis and Howell standing in the lobby.

Other testimony established that the victim was intoxicated at the time of his death and had no personal belongings on him when the police arrived other than one piece of paper. The victim's widow testified that Lampton had had a wallet and watch when she last saw him on March 6, 1979. Lampton had been paid wages of $286.88 on March 7, and had endorsed his paycheck the same date. Taylor and another man were apprehended by the police in the vicinity and shortly after the shooting was reported. The arresting officer seized $158 from the defendant. A gun also found in Taylor's possession was determined to be the murder weapon.

Based on the foregoing evidence, defendant argued that the evidence was insufficient to establish either that the victim had any personal property in his possession immediately prior to the shooting or that a forcible taking of property had taken place. Our supreme court, citing to *Tiller*, agreed with both contentions, with the consequence that both the defendant's armed robbery conviction and his death penalty were vacated.

We have also read *Woods v. Linahan* (5th Cir. 1981), 648 F.2d 973, and *People v. Pack* (1976), 34 Ill. App. 3d 894, 341 N.E.2d 4, cited in *Tiller*, and find certain factual similarities which also tend to support defendant's position here. In *Pack*, the attempted murder victim was defendant's former part-time employer who owed him money for recent work. The defendant went to her house. Through the window he saw the woman asleep. He entered the house, choked her until he thought she was dead, took money from her purse and fled. The defendant pleaded guilty and was convicted of robbery and attempt

(murder). On appeal, the court reversed the robbery conviction, finding "no factual basis *** to support the robbery charge. Force was used against the victim with the intent to kill, not to steal. The subsequent taking of property, apparently an afterthought, established only theft, which is not a lesser included offense of robbery." 34 Ill. App. 3d 894, 899-900, 341 N.E.2d 4, 8.

In *Woods*, the defendant and a codefendant were hitchhiking when the victim picked them up. The defendant subsequently struggled with the driver and killed him. She then removed $120 from the victim's wallet because she needed money to return to Atlanta. Evidence further established that, prior to the shooting, defendant and the codefendant only had $20 between them. On these facts, defendant was convicted of voluntary manslaughter and armed robbery. On appeal, the armed robbery conviction was reversed since the evidence failed to prove that defendant shot the victim in order to rob him.

■ In the instant case, as in *Tiller, Taylor, Pack* and *Woods*, we find no direct evidence that the violence used on the victim, Arthur Zielinski, was applied as a means to force him to part with any property, as theorized by the State. The fact that Steve Pecina had earlier in the evening set out to get some money owed him by his former employer suggests the possibility that he may have found the $20 given to him by the restauranteur insufficient and that he wanted or needed more, but a conviction cannot be sustained where an essential element of the offense rests on mere innuendo or suggestion. Indeed, the defendant's testimony, indicating that his violence towards the victim was the product of rage incited by Zielinski's purported homosexual advances towards his brother, Florencio Pecina, could be an equally possible theory. It is unclear why, when or how Zielinski's glasses came to rest on his bedroom dresser. The State theorizes that Zielinski must have placed them there before he retired and that he was, accordingly, in his bed when the Pecina brothers entered the room to rob him. At trial, however, when asked on cross-examination where the victim was when he was attacked, Steve said that Zielinski was standing by the dresser. If so, then it is possible that, as recited in the Pecina brothers' pretrial statements and in their testimony, the victim was pursued by Steve in the heat of his anger over the purportedly insulting homosexual remarks by Zielinski, and was attacked near the dresser upon entering the bedroom and before Zielinski prepared himself for bed.

Although we find that the facts in the present case present a very close question on this issue, in the interest of justice we are inclined to resolve it in the defendant's favor. In our opinion, the inferences

that would have to be drawn from the circumstantial facts presented by the prosecution in support of a robbery motive for the killing in this case are simply too tenuous to support the conclusion that the violence heaped upon Arthur Zielinski by his former tenant on the night of November 3, 1982, was for the purpose of robbing him. Consequently, the defendant's felony murder conviction predicated upon robbery must be reversed.

The defendant suggests that resolution of this issue in his favor would result in his discharge, since no other convictions were entered by the trial court. The State disagrees and suggests instead that, in the event the felony murder conviction must fall, we "reinstate" a conviction of murder.

We are aware of no cases in which the precise procedural issue presented in this matter has been addressed.[1] In the usual situation, when multiple-jury verdicts of guilty are returned, the trial court enters judgment on the verdicts, sentences the defendant on one or more counts, and an appeal is taken from the convictions for which he was sentenced. (See, *e.g., Pack, Tiller, People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1). The process in this case, however, was short-circuited at the request of the prosecution.

We should emphasize that the defendant was charged with murder under both sections 9—1(a)(1) and 9—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 9—1(a)(3)). The theories of defense presented on behalf of Steve as to the intentional murder charge included insanity and voluntary intoxication. At the close of all evidence, the jury was appropriately instructed on each charge

[1]See *People v. Woods* (1978), 61 Ill. App. 3d 676, 683, 378 N.E.2d 598, 603. Defendant was found guilty of attempt (armed robbery) and attempt (murder). The trial court entered judgment on the jury verdicts but did not impose a sentence for the former offense. On appeal, the court, citing *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540, and *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1, held that appellate jurisdiction was sufficiently broad to permit a remand for the purpose of imposing sentence on the attempt (armed robbery) verdict despite defendant's "careful avoidance of any issue as to the incomplete conviction." (See also *People v. Surges* (1981), 101 Ill. App. 3d 962, 428 N.E.2d 1012.) The defendant was found guilty of armed robbery, burglary and unlawful restraint. The trial court entered judgment of conviction on the burglary and armed robbery verdicts but not on unlawful restraint. The burglary verdict was subsequently vacated and the court sentenced the defendant on armed robbery and unlawful restraint. On appeal, the court held that the imposition of sentence itself constituted the final judgment on unlawful restraint and no reason existed for vacating that sentence on the basis of an "incomplete judgment." And see 24 C.J.S. *Criminal Law* sec. 1599 (1961), wherein it is stated generally that Illinois follows the rule that entry of judgment on a jury verdict finding the defendant guilty may be inferred.

as well as on these defenses. The jury's verdicts of guilty on all charges demonstrate that they rejected the defenses and found that the defendant had killed Zielinski with the intent to do great bodily harm to him. However, on April 1, 1983, when the verdicts were received and before judgment could be entered on them, the prosecutor requested a continuance for the purpose of deciding whether or not the State would seek the death penalty. In response, the trial court stated:

> "Since there is a number of judgments—there are a number of verdicts, we couldn't enter judgment on all of these. I will just withhold the entry of judgment until that date, and we can."

On July 7, 1983, the date set for the defendants' sentencing hearing, motions for new trial were presented on behalf of each defendant and denied by the trial court. Then, before proceeding to the hearing, the court solicited the prosecutor's suggestions as to the verdicts upon which judgment should be entered. The prosecutor responded as follows, "[A]s being sentenced to murder, the State *** would be asking that the judgments at this time be entered upon the felony murder as to both Steven and Florencio Pecina, as well as the robberies." The court accepted the State's recommendation and proceeded as follows:

> "The Court then would enter judgment in this case as follows, and I will take these one at a time starting with these counts.
>
> With regard to Count 1, the Court would vacate the judgment of—would vacate the verdict and not enter judgment of conviction as to Count 1 as to Steven and Florencio Pecina on the offense of murder.
>
> With regard to Count 2, which charges an accountability charge as to Florencio Pecina only, the Court would also vacate that count.
>
> As to Count 3, which charged felony murder or by definition, the murder committed while committing the forcible felony of robbery, the Court would enter a judgment of conviction on that count as to both Steven and Florencio Pecina.
>
> * * *
>
> The Court would in Count 5 enter a judgment of conviction as to Steven and Florencio Pecina as to the count of robbery, a Class 2 felony.
>
> Does the State have any—so then, it is clear then as to which counts we have judgments of conviction on, the sentenc-

ing is proceeding as to Count 3, felony murder, Counts 4 and 5, robbery."

A week later, after sentencing the defendants to natural life and 60 years on the felony murder convictions, as aforesaid, and concurrent terms of 14 years each for the robbery convictions, the court *sua sponte* vacated the robbery convictions and sentences pursuant to *People v. Abrams* (1982), 109 Ill. App. 3d 901, 441 N.E.2d 352, *People v. Jordan* (1983), 116 Ill. App. 3d 269, 452 N.E.2d 93, and *People v. Wampler* (1983), 116 Ill. App. 3d 1177 (Rule 23 order).

■ From our review of these proceedings, it is clear that the sole basis for vacating the jury verdicts on murder under count I was to avoid erroneously entered judgments of conviction on multiple counts of murder. We have concluded that felony murder cannot stand. To permit the defendants to be discharged at this point and enjoy an unjustified windfall simply because judgments were never entered on the intentional murder verdicts would make no sense at all, either at law or on the facts before us. We hold that the "vacated" jury verdicts of guilty on charges of intentional murder may be reinstated on appeal. Accordingly, we have exhaustively reviewed the record on appeal so as to afford these defendants their right to due process. In addition to those issues raised by appellate defense counsel, we have painstakingly reviewed the defendants' motions for a new trial to determine whether there is any reason not to remand these cases for entry of judgment on the verdicts of intentional murder. While we have found no error, we would not deny these defendants yet another opportunity to appeal their murder convictions to this court if, after resentencing, they elect to advance arguments attacking them on new grounds.

For the foregoing reasons, we remand this cause to the circuit court of Will County with directions to enter judgment on the jury's intentional murder verdict and to conduct a new sentencing hearing.

Reversed and remanded with directions.

SCOTT and STOUDER, JJ., concur.