THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SPENCER THOMAS, Defendant-Appellant.

First District (4th Division)   No. 1—85—3753

Opinion filed July 27, 1989.

Steven Clark and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and James Casey, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant was convicted of two counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), 9—1(a)(2)) and two counts of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)). On appeal, defendant argues:

(1) the State failed to prove him guilty beyond a reasonable doubt of the murder and armed robbery of one of the victims;

(2) his post-arrest statements should have been suppressed because they were obtained as the result of an illegal, warrantless arrest;

(3) a conflict of interest arose where both defendant and his codefendant were represented by assistant Cook County public defenders;

(4) the trial court improperly questioned prospective jurors

regarding their attitudes toward certain of defendant's basic constitutional protections;

(5) according to defendant's characterization of the record, the trial court improperly qualified its partial severance of defendant's trial from that of his codefendant on the condition that, if defendant chose to testify at trial, defendant's jury would also hear his codefendant's testimony;

(6) prejudicial error resulted when a State's witness testified regarding a post-arrest statement made by defendant's codefendant, who did not testify at trial, to the effect that his codefendant's statement accused defendant of committing the crimes;

(7) prejudicial error resulted from the admission of State evidence to the effect that defendant committed prior criminal acts, when these acts were irrelevant to a material fact at trial;

(8) prejudicial error resulted from trial testimony that defendant's case was investigated by law enforcement officers of the gang crimes unit, since there was no evidence that defendant's association with his codefendant or the victims was gang related and the critical issue in defendant's trial was his accountability for the acts of his codefendant;

(9) improper prosecutorial comments during closing argument deprived defendant of a fair trial; and

(10) the cumulative impact of these trial errors deprived defendant of a fair trial.

Finding defendant's arguments insufficient ground to disturb his convictions, we affirm.

Defendant and his codefendant, Edward Walker (hereafter Walker or codefendant), were tried in the same courtroom by separate juries, who heard only one defendant's statements but were otherwise present for the presentation of the remainder of the State's evidence. At defendant's trial, an officer of the Chicago police department testified that on December 15, 1983, he was assigned to check the well-being of residents at a single-family home located at 7720 South Luella in Chicago, Illinois. When the officer arrived, he entered the home through an unlocked back door to the house. In the kitchen, the officer found Frank Johnson (Johnson), who lived in the home with his wife, Evelyn. Johnson was clothed in pajamas and was apparently dead from gunshot wounds to the head and neck. A subsequent autopsy confirmed that Johnson died, probably immediately, from those wounds. The officer also found Evelyn Johnson in the basement of the home. She had been gagged and bound to a chair, was also clothed in

pajamas, and was also apparently dead from gunshot wounds to the head. An autopsy subsequently confirmed that she had died from those wounds.

The officer discovered that various rooms of the house were in disarray and that a safe was open and empty. The Johnsons' automobile, a blue Lincoln, was not in the garage behind the home. A later search of the house by detectives of the Chicago police department revealed approximately six grams of cocaine in a cosmetic bag found in the dining room of the residence.

A few days thereafter detectives of the Chicago police department spoke to Charles Sajna (Sajna). At trial, Sajna stated that he had been friends with Johnson for approximately 10 years and that they "hustled" together, *i.e.*, sold each other merchandise. Sajna stated that he also knew defendant's codefendant. Sajna testified that in 1983, Walker came to Sajna with some liquor that Walker wanted to sell. Sajna took Walker and the liquor to Johnson at the latter's warehouse at 79th and Essex. Johnson agreed to buy the liquor and drove with Sajna and Walker to Johnson's home at 77th and Luella. Johnson paid Sajna and Walker for the liquor at that time. Sajna testified that sometime in early or mid-December 1983, Johnson called Sajna and told Sajna that Johnson had "turned a tool deal" with Walker. During a later search of Johnson's warehouse, members of the Chicago police department discovered boxes of items that were determined to be the proceeds from robberies of a liquor truck and a Snap-On Tool truck.

Detectives of the Chicago police department also spoke to Billy Love (Love), who testified at trial that he knew Walker and had seen him a few weeks before Christmas in December 1983. Love stated that at that time, Walker was driving a blue Lincoln and wearing expensive jewelry, including a watch bearing the name "Frank Johnson." Love stated that Walker told Love that Walker had gone into a couple's home and taken the jewelry, "some powder and some money." A week later, Love testified, Walker picked up Love in the blue Lincoln and drove to an apartment at 65th and Lowe. Walker and Love took some stereo equipment from the apartment and transported it in Walker's car to the home of Walker's girl friend in Chicago Heights. A subsequent search of the apartment at 65th and Lowe by members of the Chicago police department revealed, *inter alia*, credit cards bearing the names of Frank and Evelyn Johnson.

Investigation by the Chicago police department detectives revealed that a document transferring title on the Johnsons' blue Lincoln from Johnson to Walker had been executed at a currency exchange in Chicago on December 14, 1983. An employee of the

currency exchange testified at trial that Walker, whom she identified at trial, had executed the document in her presence at approximately 3 a.m. on December 14. The employee testified that she could not positively identify the person who had signed the name of Frank Johnson to the title transfer because this person was never clearly in her view during the transaction. A forensic document examiner of the Chicago police department testified at trial that, based on comparisons of handwriting samples of Frank Johnson and samples of handwriting given by defendant following his arrest, it was his opinion that defendant signed the name of Frank Johnson to the document executed at the currency exchange transferring title on the Lincoln from Frank Johnson to Walker.

Detectives of the Chicago police department obtained a warrant for Walker's arrest on January 4, 1984. Walker was arrested by officers of the Memphis, Tennessee, police department a few months later. While in custody in Memphis, Walker gave a tape-recorded statement regarding the Chicago incident to detectives of the Chicago police department. In that statement, Walker referred to defendant by a nickname, could not provide defendant's full name, and could give a description but no specific street address for defendant's residence. Based on Walker's statement, the detectives initiated further investigation which, on March 24, 1984, produced defendant's full name and specific home address. They arrested defendant that same afternoon in the backyard of his residence without an arrest warrant.

During a post-arrest interview following waiver of his *Miranda* rights at approximately 3:30 p.m. on March 24, Chicago detectives indicated to defendant that the detectives had spoken to Walker regarding the homicides. Defendant told the detectives that he knew nothing about the incident, that he did not know Walker, that he did not know the Johnsons, and that he had not been near the scene on the day of the incident. The detectives transported defendant to another police station and subsequently interviewed defendant again, following waiver of his *Miranda* rights, at approximately 6 p.m. The detectives told defendant that Walker had "made certain statements against him" regarding the incident. Defendant responded that he knew Walker, but that he did not believe Walker would make statements against him implicating him in the homicides. The detectives told defendant that Walker had "already told the whole story and he is applying [*sic*] that you [defendant] are part of it." Defendant repeated that he did not believe Walker would say anything against him. The detectives told defendant that Walker had made a tape-recorded statement, and defendant said he "would have to hear the tape before [he

could] talk with [the detectives]."

The detectives then transported defendant to another police station to hear Walker's tape-recorded statement. After listening to approximately 10 minutes of the tape, defendant told the detectives that he would tell them "the real truth." After confirming his earlier waiver of his *Miranda* rights, defendant told the detectives that he had known Walker for a long time and that they had recently "restruck the acquaintance together." Defendant said that Walker was teaching him how to hijack trucks. Defendant specifically went into the details of the robbery of a Snap-On Tool truck that he and Walker had committed together. Defendant said that they had taken the proceeds of the robbery to a "fenceman," whom Walker knew, by the name of Frank Johnson. Defendant related that Johnson had given them some money and promised them the remainder at a later date.

Defendant also told the detectives that approximately two weeks after the robbery, Walker came to the defendant and suggested they go to Johnson's house "to get the rest of our money." He and Walker took a taxicab to Johnson's home on Luella Street. When they got out of the cab, Walker told defendant to wait outside while Walker went inside the home. Defendant waited outside. After a while, defendant became suspicious "because it was taking longer than he had figured." Defendant told the detectives that he thought that Walker "was going to cheat him out of the money that was owed him." Defendant went to the door and knocked, and Walker let him into the house. When defendant walked inside the house, he saw an elderly woman, and Walker ordered defendant to "keep an eye on the girl." At this time, defendant also observed Johnson lying on the kitchen floor. Defendant told the detectives that he "assumed" that Johnson was knocked out, and also said that Walker had knocked him out.

Defendant, Walker, and the woman moved to the rear of the house to a study area, where Walker "demanded" the elderly woman find the title to the Johnsons' blue Lincoln. There was a safe in the study, and they ordered the woman to open it. They removed the items from the safe and the woman produced the title to the car. Defendant told the detectives that he asked Walker if he had killed Johnson and that Walker indicated that he had "just knocked him out." Defendant told the detectives that he knew that Johnson was dead.

Walker then told defendant to take the woman downstairs. Defendant did so and tied the woman up, also looking through the basement to steal "whatever he could find." Defendant went upstairs and noticed a quantity of narcotics, jewelry, and approximately $4,000

in cash, on the dining room table. He and Walker split the money in half, defendant taking $2,000.

Walker then told defendant to "watch out for the cops, that we would not be long *** you act as a look out." Walker then went downstairs. After a period of time, defendant heard two shots fired in the basement, and "knew that *** Walker was killing the woman." Defendant told the detectives that at this point he became "fearful for himself" and that as Walker came up from the basement, defendant checked his gun to make sure it was loaded. He and Walker then took jewelry, some fur coats, stereo equipment, and a television set, and placed them in the Lincoln in the garage.

After they had driven away, Walker realized that he had forgotten title to the automobile. They returned to the Johnson home and Walker retrieved the document of title. He and Walker then went to an apartment at 65th and Lowe, where they unloaded "most" of the items that they had stolen. Thereafter they went to a currency exchange, where defendant signed Frank Johnson's name to the back of the title. They told the woman at the currency exchange that they were buying and selling the car "right there on the spot." They then drove to defendant's home in a southern suburb. Defendant stated that the only property that he took from the incident was cash amounting to $2,000.

In a subsequent court-reported statement made by defendant at approximately 12:15 a.m. on March 25, 1984, to an assistant Cook County State's Attorney following defendant's waiver of his *Miranda* rights, defendant related the details of his "hijack" of a Snap-On Tool truck with Walker on December 2, 1983. Defendant stated that they brought the proceeds of the robbery to Johnson at his warehouse, where Johnson paid Walker and defendant for the items. Walker told defendant that Johnson would pay them more money for the proceeds at a later date.

According to defendant's court-reported statement to the assistant State's Attorney, Walker came over to the defendant's house on December 13, 1983, and said that he wanted to go out to Johnson's house to "see about getting the rest of our money." Defendant agreed. Walker asked defendant if he had a gun, and defendant told him no. They then attempted to find a ride. Walker telephoned Johnson and told Johnson that "he wanted to come over and buy cocaine." They called a cab and arrived at Johnson's house at about 11:30 p.m. Walker had a gun with him at the time, but defendant did not.

When they arrived at Johnson's house, Walker told defendant to "Walk down a block and a half" while Walker went into the house.

Defendant did so, and Walker went inside the house. When defendant returned, he went to the door, rang the doorbell twice, and knocked once. Walker opened the door, and defendant walked into the living room area of the house. Defendant saw a white woman standing in the room. Walker gave defendant a .38 snubnose revolver with a brown handle and told defendant "to watch the lady." Walker also had a .38 revolver in his hand at this time. Walker asked the woman where the title to the Lincoln was located. Defendant walked the woman, at gunpoint, into a bedroom so she could find the title. She was unable to find it in the bedroom, so they proceeded into a study room, where a safe was located.

Walker came into the room and told the woman to open the safe. She did so and removed from the safe the title to the car and some jewelry, handing the items to Walker. Defendant said that they then went into the kitchen "where we then took her downstairs in the basement." While in the kitchen, defendant saw a body lying on the floor, which he assumed to be Johnson. When they got to the basement, defendant tied the woman to a chair and placed a gag in her mouth. As he was doing so, Walker went back upstairs. Defendant then looked around the basement for "[a]nything of value" but he could not find anything. He then went back upstairs.

When he had returned to the kitchen, defendant noticed on the kitchen counter a scale for weighing cocaine, a plastic bag of cocaine, and some cash. Defendant counted the money, amounting to approximately $4,000, and took half of that amount, explaining to Walker that this was all he was going to take because it was what he "was owed." At this time, defendant noticed a "little blood" seeping from the back of Johnson's head. He stopped Walker, who was "looking around for something," and asked him if he had killed Johnson. Walker said that he had just knocked Johnson down, that Johnson had fallen and hit his head. Defendant told Walker that "this thing got too deep, I really like to leave now." Walker "instructed" defendant that he wanted defendant to help take some things out of the house into the car. Walker then said that he had forgotten something downstairs and went to the basement. Defendant then heard two shots fired in the basement. When Walker returned from the basement, he had a gun in his hands, the same gun he had had when he came in. Defendant "decided [he] wanted to leave," but Walker told him not to. Walker took all the stereo equipment and some movie equipment and placed them in the car in the garage. Defendant took a television set to the car. Walker took a briefcase from the house and the cocaine from the kitchen counter, and told defendant "let's go." At some

point, defendant said, Walker must have placed the fur coats in the car.

After they had left the Johnsons' home, defendant and Walker realized they had forgotten to take the document of title for the Lincoln. They drove back to the house to retrieve it. Walker went back into the house to get the document while defendant watched outside "to make sure no one came up on" them. When Walker came back outside the house, they returned to the car and drove to Walker's apartment at 65th and Lowe, where they took the items from the Johnson house and placed them in the apartment. Defendant still had the gun at this time. They then went to the currency exchange, where they transferred title and "proceeded to act out a scene as though [defendant] was the owner of the car and [had] come to sell it over to [Walker]." Defendant signed Frank Johnson's name to the transfer title to Walker. He and Walker then got back in the car, and Walker drove defendant home. On the way, Walker told defendant "about how it was meant for [Walker] to be there and to do this and everything; that he didn't want [defendant] to tell; if [defendant] did, [Walker] would find a way to get back to [defendant]; and that he wished [defendant] well." While in the car, defendant took the weapon that Walker had given him out of his belt and put it under the seat because he didn't want to take it with him. He "didn't want to have nothing to do with it."

In an earlier oral statement to the assistant Cook County State's Attorney, defendant said that both he and Walker were wearing gloves on the night of the incident. He also said that when he was in the bedroom while the woman was looking for the title, he checked his gun to make sure it was loaded.

Bullets recovered from the scene and the victims' bodies could not be identified as having been fired from the same weapon. Some of the fingerprints taken from the Johnson home matched those of Frank Johnson, but the remainder could not be used for comparison.

Based upon the evidence stated above, the jury found defendant guilty of the murders and armed robberies of Frank and Evelyn Johnson. The trial court entered judgment upon these verdicts and sentenced defendant to natural life imprisonment. Defendant appeals.

## I

Defendant argues that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of the murder and armed robbery of Frank Johnson based on a theory of accountability for the actions of his codefendant.

■ Accountability is shown where the evidence permits the jury to reasonably infer that the defendant solicited, aided, abetted, agreed or attempted to aid another in the planning or commission of an offense, and that the defendant participated before or during the commission of the offense with the specific intent to commit the crime. (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c); see, *e.g., People v. Soteras* (1987), 153 Ill. App. 3d 449, 505 N.E.2d 1134.) Based upon our review of the record, we find sufficient evidence from which the jury could find defendant guilty beyond a reasonable doubt of the murder and armed robbery of Frank Johnson based upon defendant's accountability for the actions of his codefendant.

■ Defendant argues that his inculpatory statements clearly established that he did not aid or abet his codefendant's murder and armed robbery of Frank Johnson. Defendant emphasizes that his statements show that he entered the Johnson home only after his codefendant had murdered and robbed Frank Johnson, without any prior knowledge of or participation by defendant in those crimes. Given the inconsistencies in defendant's various statements, the jury was not obligated to give credence to all of the circumstances and events recited by defendant therein. (See, *e.g., People v. DiGerlando* (1964), 30 Ill. 2d 544, 551, 198 N.E.2d 503.) Defendant admitted that he aided Walker upon his entry into the home and that defendant acted as a look-out while Walker shot Evelyn Johnson and later reentered the home to retrieve title to the Johnsons' blue Lincoln. Defendant also admitted that his codefendant asked him twice before their arrival whether defendant had a gun, and that he and his codefendant went to the Johnson home in a cab after having given Johnson a pretense for their coming to the house at a late hour. Defendant further admitted to aiding his codefendant upon defendant's entry into the Johnson home, by holding Evelyn Johnson at gunpoint and directing her to search for title to the car, also at gunpoint, by taking her downstairs and tying her to a chair in the basement, by acting as a look-out while his codefendant shot her, by gathering and removing various items from the Johnson home, and by participating in the transfer of title to the blue Lincoln at a currency exchange.

In view of these admissions, and considering the evidence in the light most favorable to the State, the jury could reasonably have determined that defendant knew his purpose in waiting outside the Johnson home upon their initial arrival was to act as a look-out while his codefendant entered the home to commit the murder and armed robbery of Frank Johnson, and that defendant thereby aided and abetted his codefendant in the commission of these crimes. The jury

also could have reasonably inferred that defendant and his codefendant had a common plan to commit the armed robberies of the Johnsons, and thus determined that defendant was guilty of Frank Johnson's murder under the principles of accountability and felony murder. (See, *e.g., People v. Chandler* (1989), 129 Ill. 2d 233, 247.) Because the record contains evidence to sustain the jury's verdict, we cannot say that the State's evidence here was insufficient to prove defendant guilty beyond a reasonable doubt of the murder and armed robbery of Frank Johnson. See, *e.g., People v. Williams* (1987), 118 Ill. 2d 407, 515 N.E.2d 1230.

The cases cited by defendant in this regard are distinguishable from the base at bar. In *People v. Owens* (1975), 32 Ill. App. 3d 893, 337 N.E.2d 60, and *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026, the defendant's armed robbery conviction was reversed because there was no evidence from which a jury could have reasonably inferred that the defendant was part of a common plan to commit the robbery. In *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, and *People v. Pecina* (1985), 132 Ill. App. 3d 948, 477 N.E.2d 811, the defendant's armed robbery conviction was reversed because the evidence showed that the defendant had not killed the victim during the commission of a robbery. In the instant cause, the jury was presented with adequate evidence to find defendant accountable for the murder and armed robbery of Frank Johnson.

## II

Defendant argues that the trial court erred in denying his motion to quash the statements he made to authorities following his arrest. Defendant asserts that his warrantless arrest in the fenced portion of his backyard violated his fourth and fourteenth amendment rights to be free from unreasonable searches and seizures. (U.S. Const., amends. IV, XIV; *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (warrant needed to effectuate in-home arrest); *United States v. Dunn* (1986), 480 U.S. 294, 94 L. Ed. 2d 326; 107 S. Ct. 1134 (warrant required to search "curtilage" of home).) Defendant further argues that there were no exigent circumstances that justified the officers' decision to arrest him without first obtaining a warrant. See *Welsh v. Wisconsin* (1984), 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091; *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 766; *People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369; *People v. Foskey* (1988), 175 Ill. App. 3d 638, 529 N.E.2d 1158, *appeal allowed* (1989), 124 Ill. 2d 558.

We need not and do not address these arguments. Assuming

*arguendo* that defendant's arrest should have been preceded by a warrant, the defendant's subsequent confession was nevertheless admissible. The record shows that intervening circumstances between the time of defendant's arrest and his subsequent confession purged the taint of the defendant's allegedly improper arrest.

In *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 766, the Illinois Supreme Court stated, "[A] defendant's confrontation with untainted evidence, which induces in the defendant a voluntary desire to confess, may be a legitimate intervening circumstance" to dissipate the taint of the defendant's earlier illegal arrest. (117 Ill. 2d at 224.) To support this statement, the Illinois Supreme Court referred to *People v. Gabbard* (1979), 78 Ill. 2d 88, 389 N.E.2d 574, in which the court held that defendant's confrontation with a sketch prepared prior to his arrest, which defendant acknowledged resembled him, purged the taint of his illegal arrest and rendered his subsequent confession voluntary. In so ruling, the court in *Gabbard* noted with approval the decision of *Commonwealth v. Wright* (1975), 460 Pa. 247, 332 A.2d 809, in which a defendant's confession was held to be admissible, in spite of an illegal arrest, on the ground that the confession had been prompted by intervening circumstances when defendant was confronted with his codefendant's untainted confession. Illinois Appellate Court decisions have also held that a defendant's confrontation with untainted evidence is an intervening circumstance sufficient to purge the taint of an illegal arrest. See, *e.g., People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221; *People v. Faulisi* (1977), 51 Ill. App. 3d 529, 366 N.E.2d 1072; see also *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296; *People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287.

Based upon this precedent, we conclude that defendant's confrontation with the tape-recorded statement made by his codefendant was an intervening circumstance which, when viewed in conjunction with other circumstances surrounding defendant's inculpatory statement, purged the taint of his allegedly illegal arrest. The record here shows that defendant admitted his involvement approximately four hours after he was arrested. On each occasion that he was interrogated by authorities, defendant was given and knowingly and voluntarily waived his *Miranda* rights. Contrary to defendant's argument, we find nothing in the record to indicate flagrant police misconduct such as an arrest without probable cause designed to conduct a "fishing expedition," and we note that his codefendant's statement was legally obtained prior to defendant's arrest. On this record, we cannot say that the trial court's determination that defendant's inculpatory

statements were the product of his free will, because of the intervening circumstance of defendant's confrontation with his codefendant's accusations, was against the manifest weight of the evidence. See, e.g., *Lekas*, 155 Ill. App. 3d at 415.

■ Defendant argues that confronting him with the tape-recorded statement should not be considered as intervening circumstance. Defendant notes that courts have held that confronting an illegally detained suspect with the results of a polygraph test is insufficient to purge the taint of an illegal arrest (citing *People v. Franklin* (1987), 115 Ill. 2d 328, 504 N.E.2d 80; *People v. Haymer* (1987), 154 Ill. App. 3d 760, 506 N.E.2d 1378; *People v. Thomas* (1984), 123 Ill. App. 3d 857, 463 N.E.2d 832; *People v. Fox* (1982), 111 Ill. App. 3d 243, 443 N.E.2d 1179), and points out that the polygraph has been judicially held to be a test of dubious scientific validity and therefore cannot prompt a careful exercise of free will by an accused in order to dissipate the taint of the illegal arrest. Defendant also observes that the statement of a codefendant implicating an accused has been held to be presumptively unreliable. (*Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *People v. Rogers* (1988), 123 Ill. 2d 487, 528 N.E.2d 667.) Drawing an analogy between polygraph results and a codefendant's inculpatory statement based upon this judicial determination of the questionable reliability of both a polygraph and a codefendant's inculpatory statement, defendant asserts that confronting a defendant with his codefendant's statement, similar to confronting a defendant with the results of a polygraph test, should not be held an intervening circumstance that dissipates the taint of an illegal arrest.

A codefendant's untainted confession is distinguishable from polygraph results, however. A codefendant's confession will be admitted into evidence if it is found to be reliable because supported by independent indicia of reliability. (See, e.g., *People v. Duncan* (1988), 124 Ill. 2d 400, 530 N.E.2d 423.) The results of a polygraph test, in contrast, have been determined to be inherently unreliable and therefore per se inadmissible at trial. (See, e.g., *People v. Taylor* (1984), 101 Ill. 2d 344, 462 N.E.2d 478.) As a result, we do not find defendant's analogy persuasive and decline to adopt defendant's reasoning as ground to reach a conclusion contrary to the precedent stated above.

■ Defendant also claims that because his confrontation with the tape was itself a product of the illegal arrest, his listening to the tape cannot be considered an intervening circumstance. We disagree. The logical consequence of defendant's reasoning would preclude all confrontations of a defendant with any untainted evidence from ever be-

ing considered sufficient to purge the taint of an illegal arrest. We decline to adopt such a position in the case at bar. *People v. Sanders* (1977), 55 Ill. App. 3d 178, 370 N.E.2d 1213, is inapposite to the instant cause with respect to this issue, since the question presented in *Sanders* was whether police officers had continued interrogating defendant following his invocation of his right to an attorney.

■ Defendant also contends that confrontation with evidence can purge the taint only if the evidence is both new and untainted, citing *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221. Defendant does not argue that his codefendant's taped statement was untainted. (See *Avery*, 180 Ill. App. 3d 146, 534 N.E.2d 1296; *Stofer*, 180 Ill. App. 3d 158, 534 N.E.2d 1287.) Defendant does argue, however, that the tape was not "new" because the officers "informed [defendant] repeatedly that his [codefendant] had implicated him in the crime." Contrary to defendant's assertion, the authorities did not repeatedly confront defendant with the tape recording of his codefendant's accusations. Under the facts of this case, we can find no reversible error in the trial court's ruling.

### III

■ Defendant maintains that he was denied effective assistance of counsel where both he and his codefendant were separately represented by assistant Cook County public defenders. It has been held that such representation by the Cook County public defender's office does not amount to *per se* conflict of interest, and defendant makes no showing here that the circumstances presented an actual conflict of interest. (See *People v. Banks* (1988), 121 Ill. 2d 36, 526 N.E.2d 617.) Accordingly, we determine that defendant's contention does not entitle him to a new trial.

### IV

Defendant argues that the trial court improperly questioned prospective jurors regarding their attitudes toward certain of defendant's basic constitutional protections, in violation of *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062. The record shows that at the outset of *voir dire*, the trial court denied defendant's motion for attorney participation in questioning of prospective jurors. The trial court also apparently declined to ask specific questions posed by defendant in a written list tendered to the court; this 10-page document included at least 10 questions regarding the presumption of innocence, 17 questions regarding the State's burden of proof beyond a reasonable doubt, and five questions regarding defendant's right to remain silent

and present no evidence on his own behalf. In denying defendant's motion for attorney participation and for the specific questions listed in his written document, the trial court commented that the topics raised in defendant's list would be covered in the court's opening comments to the prospective jurors as a group, and added that "if you have any questions after I get done voir direing the jury, I will be happy to ask the questions." Defendant expressed no objection to this ruling. The trial court then addressed the prospective jurors as a group with the following relevant remarks:

"I will tell you certain things about the law at this time and at the conclusion of the trial again give you certain written instructions which are the law which is applicable as far as the laws in this case is [*sic*] concerned. *** You must follow the instructions as I give it [*sic*] to you. In other words, if I tell you the law is a particular way, that is the way it is. You may not go back there and say I have a friend of mine who looks a lot smarter than this judge or I read a book or the newspaper last week, the law should be this way. You may not do that, [you] must accept the law as I give it to you. That is the only way our system of justice has continued to flourish over all these many, many years.

Considering that, is there anybody out there, that will not follow the law as I give it to them, anybody? Are you sure? Are you sure there is no juror? This is going to be a trick question, I will tell you why a little later on.

Is there any juror that will not follow the law as I give it to them, anybody? Nobody is raising their hand, remember that.

As I tell all jurors, the Court is the boss of the law. Then what is your function? Your function, put in the simplest terms, is to be the boss of the facts. In other words, you will hear the facts from the witness stand. Based upon those facts as well as the law which I give to you as well as all the exhibits that have been offered and received you will decide whether the defendant is guilty or not guilty of the charge against him. So, you have your function to perform, that is to be the boss of the facts, I have my function to be the boss of the law. ***

The defendant has entered a plea of not guilty. And as the defendant sits in the court at the present time he is presumed to be innocent and that innocence remains with him throughout the case and until the State proves him guilty beyond a reasonable doubt. The defendant need not prove anything. The burden is always upon the State to proof [*sic*] him guilty beyond a rea-

sonable doubt and this burden never shifts.

So, if I were to take the first twelve jurors whose names were called, tell you to go back at this time and give me a verdict I am sure you'd look at me and say what is that man talking about, how can we possibly give a verdict at this time since we have not heard anything? You'd be absolutely wrong because at this time your verdict would have to be not guilty since you didn't hear anything and it is up to the State to prove him guilty beyond a reasonable doubt. Do you all understand that?"

At the court's close of these comments, defendant did not inform the trial court that he found the trial court's remarks incomplete with respect to his right to remain silent, nor did defendant request that the prospective jurors be more specifically informed of the defendant's right not to testify on his own behalf. After each panel of jurors had been individually questioned, the court asked the group whether there was anything he had not brought out that might affect the jurors' ability to give both sides a fair trial.

During the course of *voir dire*, after the first panel had been questioned, defendant requested a sidebar and, outside the presence of the prospective jurors, asked the court to excuse certain jurors for cause. The trial court denied this request. Defense counsel then stated, "I would like to put on the record the fact that we asked that you ask each individual juror if they understood the burden of proof that the State has the burden of proof at all times and if they understood that burden of proof. You did not ask specifically each juror." The trial court responded, "So what?" Defense counsel then continued, "Secondly, we wanted them to be asked individually if they would not hold anything against the defendant if he failed to testify." The trial court replied, "I told you before, that I have given the instructions, I tell them to follow the law. I don't know how I can make it clearer—." Thereafter the trial court resumed its *voir dire*.

Upon completion of jury selection, defendant said nothing about the trial court's allegedly inadequate questioning of the prospective jurors. At the close of all the evidence, the jury was instructed, *inter alia*, that the defendant had the right not to testify at trial and that the jurors could draw no negative inference against the defendant because of his failure to testify. In his motion for a new trial, defendant argued that the trial court "violated *People v. Zehr* (1984), 103 Ill. 2d 472 when it refused to ask jurors individually: first, that if at the end of evidence, each juror felt that the State had failed to sustain its burden of proof, would they hesitate to return a 'Not Guilty' verdict?

Second, that if Mr. Thomas did not testify, would they hold it against Mr. Thomas?" Defendant's new trial motion also contended that the trial court denied him a fair trial when it "[d]enied defendant's proposed voir dire questions[;] [r]efused individual voir dire questions[;] [and] [r]efused to allow defense counsel to participate in voir dire questioning."

■ Based upon this record, we conclude that the trial court's comments to the prospective jurors sufficiently complied with the requirements of *Zehr* that a judge probe jurors' potential bias with respect to a defendant's constitutional rights (1) to be presumed innocent and (2) to be proved guilty by the State beyond a reasonable doubt. The trial court's remarks to prospective jurors in the case at bar regarding the presumption of innocence and the State's burden of proof were substantially similar to those found acceptable by the Illinois Supreme Court in *People v. Emerson* (1987), 122 Ill. 2d 411, 425-27, 522 N.E.2d 1109. Based upon *Emerson*, we find no reversible error in the manner in which the trial court conducted *voir dire* in the instant case regarding jurors' attitudes toward the presumption of innocence and the State's burden of proof. See also *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.

■ Furthermore, defendant has waived any claim that the trial court's comments were inadequate regarding his right not to testify on his own behalf at trial. The record demonstrates that, following the trial court's comments to prospective jurors as a group, defendant did not indicate to the court that defendant found the court's comments inadequate, nor did defendant request that the court inform the jurors more specifically regarding the defendant's right not to testify on his own behalf. During the course of the trial court's individual questioning of jurors, defendant only once asked that the court question prospective jurors regarding their possible bias with respect to defendant's right not to testify at trial; this objection, however, requested that the court ask *all* of defendant's written questions regarding his right to remain silent, and that the court do so with respect to each prospective juror *individually*. The trial court was not obligated to ask each juror individually regarding that juror's attitude toward defendant's constitutional right to remain silent, nor was the court obligated to ask the precise questions formulated by the defense. (See, *e.g., People v. Poole* (1988), 167 Ill. App. 3d 7, 520 N.E.2d 1017; *People v. Hopkins* (1987), 160 Ill. App. 3d 967, 513 N.E.2d 1011; see also *People v. Hughes* (1988), 168 Ill. App. 3d 758, 522 N.E.2d 1275.) Defendant did not thereafter request that the panels of

jurors be questioned as a group regarding the defendant's right to remain silent, nor did defendant inform the court that defendant found inadequate the court's question to panels of jurors regarding whether there was anything additional which would prevent the jurors from being fair to both the State and the defendant. Because defendant did not timely inform the court of his belief that the court's comments to prospective jurors as a group were inadequate regarding his right to remain silent, defendant cannot argue such grounds for the first time on appeal. See *People v. Coleman* (1989), 129 Ill. 2d 321, 340, citing *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, and *People v. Holman* (1984), 103 Ill. 2d 133, 181-82, 469 N.E.2d 119 (Ryan, C.J., concurring in part and dissenting in part); see also *People v. Barnett* (1988), 173 Ill. App. 3d 477, 527 N.E.2d 1071; *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744.

Defendant asserts that our disposition of this issue is controlled by *People v. Starks* (1988), 169 Ill. App. 3d 588, 523 N.E.2d 983. In that case, the trial court neglected to inform prospective jurors of the defendant's right not to testify on his own behalf at trial. *Starks* is inapposite to the case at bar, however, since the question had been properly preserved for review. See also *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.

## V

■■ Defendant asserts that the trial court improperly qualified its partial severance of defendant's trial from that of his codefendant on the condition that, if defendant chose to testify at trial, defendant's jury would also hear his codefendant's testimony. We have reviewed the transcript of the trial court's oral pronouncements, and discover that the trial court did not issue the condition defendant advances upon review. The record shows that the trial court, in ruling upon a renewed, mid-trial defense motion for full severance because of the defendants' mutually inculpatory statements, simply informed the defendant that, if his codefendant chose to testify, defendant's jury would be permitted to hear that testimony. We find no error in this ruling based on the legal principles regarding severance to protect defendants who have made mutually inculpatory statements. (See, *e.g., Duncan*, 124 Ill. 2d 400, 530 N.E.2d 423.) Because defendant's contention depends upon an inaccurate characterization of the record, we find his argument insufficient ground to reverse his convictions.

## VI

Defendant contends that prejudicial error resulted when a State's witness testified regarding a post-arrest statement made by defendant's codefendant, who did not testify at trial, to the effect that defendant had committed the crimes. Defendant claims that the trial court should have instructed the jury that the witness' testimony was to be considered only for the limited purpose of showing the circumstances surrounding the defendant's making of his inculpatory statements. Defendant asserts that such a limiting instruction would have been proper, citing *Tennessee v. Street* (1985), 471 U.S. 409, 85 L. Ed. 2d 425, 105 S. Ct. 2078.

■■■ However, defendant never objected to the witness' testimony at trial and never requested that such a limiting instruction be given to the jury. Consequently, defendant's argument is waived on appeal. (See *People v. Coleman*, 129 Ill. 2d at 340, citing *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, and *People v. Holman* (1984), 103 Ill. 2d 133, 181-82, 469 N.E.2d 119 (Ryan, C.J., concurring in part and dissenting in part).) In addition, because the defendant did not repudiate his own inculpatory statements at trial, and because the witness' testimony consisted of a cursory reference to the codefendant's statement which did not recount the details of the codefendant's statement and provided only the general information that the codefendant had implicated the defendant, we find no plain error in the witness' testimony at trial. *Cf. People v. Johnson* (1987), 116 Ill. 2d 13, 506 N.E.2d 563; *People v. Burns* (1988), 171 Ill. App. 3d 178, 524 N.E.2d 1164.

## VII

■■■ Defendant asserts that prejudicial error resulted from the admission of those portions of his inculpatory statements to the effect that defendant committed an armed robbery of a Snap-On Tool truck with his codefendant, because this conduct was irrelevant to a material fact at trial. Defendant argues that past "bad acts" of a defendant are generally inadmissible at trial, because the prejudicial effect of such evidence outweighs its probative value. However, the evidence in the instant cause was relevant and admissible to prove defendant's motive in committing the crimes for which he was convicted, and we find no error in its admission into evidence at trial for this purpose. See, *e.g., People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339; *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840; *People v. Escobedo* (1986), 151 Ill. App. 3d 69, 502 N.E.2d 1263.

## VIII

■■ Defendant contends that prejudicial error resulted from trial testimony that defendant's case was investigated by law enforcement officers of the gang crimes unit, since there was no evidence that defendant's association with his codefendant or the victims was gang-related and the critical issue in defendant's trial was his accountability for the acts of his codefendant. The record indicates that the trial court clearly admonished the jury that the witnesses' association with the gang crimes unit had no bearing on the case, and that there was no gang-related incident involved in defendant's trial. We conclude that the trial court properly exercised its sound discretion, to ensure that the defendant was not prejudiced by the few references to the gang crimes unit made at trial, by so admonishing the jury, and also that any error was harmless under the facts of this case. See, *e.g., People v. Simpson* (1984), 129 Ill. App. 3d 822, 473 N.E.2d 350.

## IX

■■ Defendant maintains that improper comments by the State during closing argument deprived him of a fair trial. We have reviewed the record and cannot say that the State's comments during closing argument were so inflammatory as to deprive defendant of a fair trial. See, *e.g., People v. Caballero* (1988), 126 Ill. 2d 248, 271-73, 533 N.E.2d 1089.

## X

■■ Defendant argues that cumulative error deprived him of a fair trial. However, we determine, for the reasons set forth above, that the majority of defendant's claims do not present erroneous rulings by the trial court judge. Nor are we able to say on this record that the few minor errors occurring in the defendant's lengthy trial were sufficient to reverse his convictions and grant him a new trial.

For the reasons stated, the defendant's convictions and sentence are affirmed.

Affirmed.

JIGANTI, P.J., and LINN, J., concur.